JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ZERO TECHNOLOGIES, LLC

## DEFENDANTS

THE CLOROX COMPANY and BRITA, LP

**(b)** County of Residence of First Listed Plaintiff ___Bucks County___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ___Alameda County___
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Baker & Hostetler LLP - 215-564-2898
1735 Market St., Suite 3300, Philadelphia, PA 19103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
     Plaintiff
- [ ] 2  U.S. Government
     Defendant
- [X] 3  Federal Question
     *(U.S. Government Not a Party)*
- [ ] 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                        *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury  - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2 and 15

Brief description of cause:
Anticompetitive, exclusionary, deceptive, and unfair conduct

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
2022-10-06

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _7 Neshaminy Interplex, Suite 116 Trevose, PA 19053_

Address of Defendant: _1221 Broadway, Oakland, CA 94612_

Place of Accident, Incident or Transaction: _Pennsylvania_

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? — Yes ☐ No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? — Yes ☐ No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? — Yes ☐ No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? — Yes ☐ No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _2022-10-06_ _____ _30250_
Attorney-at-Law / Pro Se Plaintiff       Attorney I.D. # (if applicable)

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☒ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify): _____*

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify): _____*
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _Carl W. Hittinger_ , counsel of record *or* pro se plaintiff, do hereby certify:

- ☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought

DATE: _2022-10-06_ _____ _30250_
Attorney-at-Law / Pro Se Plaintiff       Attorney I.D. # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

ZERO TECHNOLOGIES, LLC        )
                                          )
                 Plaintiff,          )       Civil Action No. _____
                                          )
       v.                                 )
                                          )
THE CLOROX COMPANY and BRITA, LP,   )
                                        )
           Defendants.        )

## <u>VERIFIED COMPLAINT</u>

1.     Zero Technologies, LLC ("ZeroWater"), by and through its attorneys Baker & Hostetler LLP, alleges as follows against The Clorox Company ("Clorox") and Brita LP (collectively, "Brita" or "Defendants").

### I.    INTRODUCTION

2.     This action seeks treble damages, injunctive, and other relief for Brita's anticompetitive, exclusionary, deceptive, and unfair conduct designed to restrain trade in the market for NSF/ANSI-certified high-performance gravity-fed water filters sold in the United States.

3.     Home water-filtration systems, including gravity-fed water filters, have grown in popularity and demand in the United States due to a heightened public awareness of health concerns regarding untreated tap water.

4.     Tap water's quality varies across the United States but is generally fed by surface water and ground water. Surface water can be high in contaminants, while ground water is high in sediments. In addition, recent documented negative health effects due to the existence of lead found in drinking water across the country have shed a light on the detrimental impact of such potential contaminants.

5.      In 2007, NSF International ("NSF") and its accreditation body, the American National Standards Institute ("ANSI"), adopted a new standard that had a direct impact on whether high-performance gravity-fed water filter products could make certain contaminant reduction claims and could be certified by NSF, a critical designation in the sales market.  The NSF/ANSI 53 Standard (2007) offers over 50 contaminant reduction claims and is known as the "Health Effects" standard (the "Health Effects Standard" or "NSF/ANSI 53 Standard").

6.      During the consideration of, and after the adoption of, the NSF/ANSI 53 Standard, Brita set out to acquire a monopoly of the market for high-performance gravity-fed water filter products certified by the NSF/ANSI 53 standard (the "certified-product market") in the United States through its anticompetitive conduct.

7.      Specifically, during the course of its membership and participation on the NSF task forces responsible for considering and adopting the new standard since at least 2005, Brita continuously deceived NSF and ANSI by failing to disclose its intention to hold a patent essential to the standard. In addition, even after the standard was adopted, Brita continuously and, to this day, deceived NSF and ANSI, and violated various NSF and ANSI policies and the antitrust laws, which together require disclosure of patent rights and intentions relevant to proposed and adopted standards. Further, in addition to the actual requirements of the NSF and ANSI policies, it is generally well-known and understood, and was or should have been known by Brita, that standard setting organizations ("SSOs") such as NSF operate under policies whereby such disclosure is required, including under the antitrust laws.

8.      These policies were designed to avoid the very situation at issue here – one where an industry member involved in the standard setting process intends to hold or holds a patent essential to the standard—that is one whose use would be required for compliance with that

standard—without disclosing this to the SSO and public, and thus unlawfully acquires monopoly power that prevents other industry participants from being able to comply with the standard and receive certification.

9.     Brita actively participated as members of NSF task forces, including to learn of NSF's intention to, and eventual adoption of, the NSF/ANSI 53 Standard, and related technical information, and used that knowledge to develop a patent essential to the standard and lay its plan for a patent "ambush" of the industry after over a decade of ongoing deception.

10.     While deceiving NSF and ANSI and keeping its own patent rights, applications, and intentions secret in violation of NSF's and ANSI's policies, the antitrust laws, and known obligations of industry members involved in SSOs, Brita intended to, and eventually did, hold rights to a patent that is essential to the Health Effects Standard.

11.     Following the adoption of the NSF/ANSI 53 Standard in 2007, Brita continued its deception until the industry was "locked in" to that standard, with all of Brita's competitors investing time, money, and other valuable resources in products that meet the standard and obtaining certification of those products, before beginning its patent offensive. The ability to be certified under the NSF/ANSI 53 Standard to make certain contaminant reduction claims is critical to the sale and marketability of high-performance gravity-fed water filters. All this time, Brita was lying in wait with an intention to block its competitors from being able to meet the standard and obtain certification. If its competitors had known about Brita's patent, then rather than being deceived, they would have used their resources differently and pursued alternative ways to compete in the relevant market.

12.     In 2012, Brita's U.S. Patent No. 8, 167,141  (the "'141 Patent") was issued. The '141 Patent was intentionally developed as a patent intended to be required for products to meet

the NSF/ANSI 53 Standard. Indeed, the '141 Patent expressly incorporates the NSF/ANSI 53 Standard. The '141 Patent claims that it drew on patent applications dating back to at least 2004. Those prior patent applications and the technology at issue were all within the knowledge of Brita and its employees who participated in the NSF task forces responsible for the adoption of the standard.

13.     NSF relied upon Brita's silence and purported compliance with its and ANSI's policies – and de facto confirmation that it did not hold any relevant patent rights, applications, or intentions impacting the standard or preventing industry participants from meeting it – in adopting the standard. Simply put, had NSF or ANSI known about Brita's patent rights and intentions, and this information been made available to the public as required, NSF would not have adopted the standard in the form that it did.

14.     But Brita did not disclose its patent rights, applications, or intentions as required by NSF's and ANSI's policies and the antitrust laws, and, upon information and belief, still has not formally done so despite a continuing obligation to disclose that information to NSF.

15.     Instead of complying with the applicable policies and laws, Brita continued its deception by keeping its patent rights, applications and related intentions secret and then initiated actions, years later, against alleged infringers of its patent – Brita's competitors in the certified-product market – both in front of the International Trade Commission ("ITC") (*In the Matter of Certain High-Performance Gravity-Fed Water Filters and Products Containing the Same*, Investigation No. 337-TA-1294, ("ITC Action")) and in District Court (D.Del., Case No. 1-21-cv-01801). These actions are intended to ensure that no company other than Brita could achieve certification under the NSF/ANSI 53 Standard and doom the marketability of competing

products, with the aim of Brita acquiring an unlawful monopoly. These actions were filed by Brita on December 23, 2021.

16.     Because the ability to make certain contaminant reduction claims with certification by the NSF is effectively required for the sale and marketability of high-performance gravity-fed water filters, and Brita's '141 Patent prevents competing products from meeting and being certified under the standard, the market will be devoid of products to compete with Brita's own, enabling Brita to charge monopoly prices. This is particularly egregious because Brita's competitors, but for Brita's deception, would have, upon information and belief, redeployed their resources into developing alternative, competing products. The harm is poignant because high-performance gravity-fed water filters, which are portable and can fit inside a standard refrigerator, are the choice water filtration products for many consumers due to their lower cost compared to in-line filters, as well as those without the ability to install in-line products, such as home renters and residents of high-density facilities (e.g., college dormitories).

17.     In addition, ZeroWater's product is currently the *only* high-performance gravity-fed water filter that has been certified under the NSF/ANSI 53 Standard's PFOA/PFOS, lead, and chromium reduction claims. A recent EPA advisory indicates that some negative health effects may occur from drinking water with concentrations of the chemical group PFOA/PFOS that are even near zero. Therefore, Brita's anticompetitive conduct prevents consumers from accessing the only product that effectively eliminates the dangers of PFOA/PFOS, lead, and chromium.

18.     This conduct amounts to a violation of Section 2 of the Sherman Act for unlawful monopolization and unlawful attempted monopolization. This conduct also gives rise to claims

5

for violation of unfair competition laws, third party beneficiary breach of contract, and breach of the implied covenant of good faith and fair dealing.

## II.   PARTIES

19.     Zero Technologies, LLC is a limited liability company organized under the laws of the State of Delaware having a principal place of business at 7 Neshaminy Interplex, Suite 116 Trevose, PA 19053. Zero Technologies, LLC lists ZeroWater water filters for sale on its website, www.zerowater.com.

20.     The Clorox Company is the ultimate parent company of Brita LP. Clorox is a corporation incorporated under the laws of Delaware having a principal place of business at 1221 Broadway, Oakland, California 94612.

21.     Brita LP is an Ontario limited partnership organized under the laws of Canada with an office at Faubourg du Lac 11, 2000 Neuchatel, NE Switzerland. Brita manufactures, distributes, and sells water filtration products in the United States and Canada through its affiliates, including Brita Products Company and Clorox Sales Company.

## III.   JURISDICTION AND VENUE

22.     This action arises under the Sherman Act, 15 U.S.C. §2 and Pennsylvania law.

23.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 and 15 U.S.C. § 15.

24.     Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 because a substantial part of the events or omissions giving rise to the claims occurred here and because Defendants transact business here, either directly or through their agents.

25.     All Defendants are subject to the personal jurisdiction of this Court because they engaged in purposeful conduct in or directed to Pennsylvania, either directly or through their agents, as set forth in detail herein.

## IV. NATURE OF THIS ACTION

26. Defendants' anticompetitive, exclusionary, deceptive, and unfair conduct stems from the following actions.

### A. The NSF/ANSI 53 Standard adoption process was governed under NSF and ANSI policies that require disclosure of any patent rights that may impact a standard.

27. NSF is an SSO that, among other things, propagates standards for achieving acceptable contaminant reduction in drinking water.

28. ANSI is the accreditation body that oversees the U.S. voluntary standardization process and conformity assessment activities in the United States. ANSI accredits NSF and ensures that it is developing standards within ANSI's framework.

29. When a product meets a standard propagated by NSF following third-party testing, it is said to be "certified" by NSF and can use certain logos and insignia designed to inform the public that the product has been certified by NSF. In addition, a product that is certified by NSF is posted to the NSF website under a given standard.

30. Relevant to this action is the NSF/ANSI 53 Standard, which is known as the "Health Effects" standard. This standard establishes minimum requirements for systems designed to reduce specific health-related contaminants, including lead, *Cryptosporidium*, VOCs and chromium.

31. The purpose of the NSF/ANSI 53 Standard is to establish minimum requirements for materials, design and construction, and performance of drinking water treatment systems that are designed to reduce specific health-related contaminants in public or private water supplies.

32. In order to receive certification under the NSF/ANSI 53 Standard performance claim, a manufacturer must submit a product to NSF for testing. For example, for a product to qualify for a lead reduction claim, it must meet certain testing requirements regarding lead

reduction set forth in the standard, and then NSF dictates the claim that can and must be included on the product.

33.     NSF certification for certain contaminant reduction claims, lead in particular, is effectively required for the sale and marketability of high-performance gravity-fed water filters.

34.     The NSF/ANSI 53 Standard was developed by the NSF Joint Committee on Drinking Water Treatment Units using the consensus process described by ANSI.

35.     Discussions at NSF regarding the acceptable level of contaminants for systems designed to reduce those contaminants began after the discovery that the amount of lead in the drinking water of certain municipalities was significantly higher in particulate (colloidal) lead than previously thought.

36.     At NSF's fall 2004 Drinking Water Treatment Unit Joint Committee meeting, two task groups were launched to evaluate revisions to the NSF standard for lead reduction at pH 8.5: the "Gravity-Feed Lead Reduction Task Group" which consisted of members affiliated with products that used a gravity-fed filtration system, and "Lead pH8.5 Plumbed-In Task Group" (the "Plumbed-In Task Group") which consisted of members affiliated with products attached directly to the plumbing system in a home. Together, the Gravity-Feed Lead Reduction Task Group and the Plumbed-In Task Group made up the Joint Committee on Drinking Water Treatment Units. The Plumbed-In Task Group took primary responsibility for developing the challenge water for testing lead reduction at pH 8.5 that lead to the development of the NSF/ANSI 53 Standard.

37.     The task groups were open to participation by any members of the industry.

38.     NSF and ANSI have clearly understood policies that emphasize the importance of SSO members' prompt disclosure of intellectual property rights that might impact proposed and

adopted standards. The purpose of those policies is to benefit the public by preventing SSOs

from unknowingly adopting patent-encumbered standard. Such policies also benefit other

members of the SSO as well as other industry participants.

39.     Importantly, at the beginning of each task group meeting, the following NSF

"Antitrust Statement" was read to all attendees by the Committee Chair or another member of

the committee: "Because this meeting involves representatives of competing businesses, it is

important that I get everyone's agreement before we begin that the meeting will be conducted in

full compliance with the antitrust laws….If any of you have any questions, I refer you to the NSF

Antitrust Guide for the conduct of meetings."

40.     In turn, NSF's Antitrust Guide states that "[s]tandards programs must not be used

as devices to … lessen competition" and that "[s]tandard setting activities may raise antitrust

concern if they are intended to preclude the use of another competitor's product."

41.     Further, the NSF task groups were bound by ANSI Essential Requirements: Due

process requirements for American National Standards ("ANSI Essential Requirements"). ANSI

Essential Requirements contain a section titled ANSI patent policy–Inclusion of Patents in

American National Standards ("ANSI Patent Policy"), which has been expressly adopted and

implemented by NSF.

42.     Specifically, NSF's Standards Development and Maintenance Policies, which

were first adopted in May 1984 and last revised in September 2013, expressly state that "[a]n

NSF Standard may include the use of a patented item, if it is considered that technical reasons

justify this approach. If a standard requires the use of an essential patent claim (one whose use

would be required for compliance with that standard), NSF <u>shall</u> comply with the current version

of ANSI Essential Requirements…" (emphasis added). Upon information and belief, prior

versions of the NSF's Standards Development and Maintenance Policies in effect at the time

Brita participated in the tasks forces related to the adoption of the NSF/ANSI 53 Standard,

expressly included ANSI's Patent Policy in the text of NSF's policies.

43.   Further, in its Standards Development and Maintenance Policies, NSF expressly

stated that "these Policies are consistent with the OMB A- *Federal Participation in the*

*Development and Use of Voluntary Standards*." That circular provides that voluntary standards

"include provisions requiring that owners of relevant intellectual property have agreed to make

that intellectual property available on a non-discriminatory, royalty-free or reasonable royalty

basis to all interested parties." §4.a. And a revised version of that circular states, "voluntary

consensus standards bodies . . . often have intellectual property rights (IPR) policies that include

provisions requiring that owners of relevant patented technology incorporated into a standard

make that intellectual property available to implementers of the standard on non-discriminatory

and royalty-free or reasonable royalty terms (and to bind subsequent owners of standards

essential patents to the same terms). In order to qualify as a 'voluntary consensus standard' for

the purposes of this Circular, a standard that includes patented technology needs to be governed

by such policies, which should be easily accessible, set out clear rules governing the disclosure

and licensing of the relevant intellectual property, and take into account the interests of all

stakeholders, including the IPR holders and those seeking to implement the standard." §2.d.

44.   NSF also expressly affirmed in its Standards Development and Maintenance

Policies, that "[t]hese Policies meet the requirements of due process as defined in the current

version of American National Standards Institute (ANSI) Essential Requirements…. NSF

Standards are intended to be consistent with government regulations and codes, when they exist.

These Policies are written in a manner to incorporate all procedural requirements set forth in the ANSI process."

45.     By expressly adopting ANSI's process, NSF bound itself to those requirements including ANSI's Patent Policy, which imposes certain obligations on NSF when it becomes aware that a proposed or adopted standard is impacted by a patent. Specifically, ANSI's Patent Policy requires participants in the standard setting process to provide assurances that either the "party does not hold and does not currently intend holding any essential patent claim(s)" or that it will license those rights at no cost or FRAND terms and rates in the event the standard is enacted notwithstanding the existence of a standard essential patent.

46.     In turn, ANSI's Guidelines for Implementation of the ANSI Patent Policy (the "ANSI Guidelines") discusses disclosure of patent rights and states that "[t]he Patent Policy applies with equal force to situations involving (1) the discovery of essential patent claims that may be required for use of a standard subsequent to its adoption and (2) the initial issuance of a patent after adoption. Once disclosure is made, the holder is obligated to provide the same assurances to [NSF] as are required in situations where essential patent claims exist or are known prior to approval of a proposed standard as an American National Standard."

47.     In addition to the Patent Policy, the ANSI Essential Requirements contain an independent Antitrust Policy (separate and apart from NSF's Antitrust Guide) which, as adopted by NSF, requires that "[s]tandards shall be developed in accordance with applicable antitrust and competition laws and meetings amongst competitors to develop American National Standards are to be conducted in accordance with these laws."

48.     The purpose of ANSI's Patent Policy, which was adopted by NSF, is to ensure that the SSO has the ability to decide whether to adopt or alter a standard so that industry

participants' patent rights do not impact compliance with the standard. Indeed, "[c]ompliance (or non-compliance) with the Patent Policy is one of the criteria to be considered by ANSI's Board of Standards Review in determining whether to approve (or withdraw approval of) an American National Standards." ANSI Guidelines § II.

49.     The ANSI Essential Requirements further state that SSOs remain subject to audit even after a standard is adopted and that a violation of ANSI's Patent Policy is grounds for a withdrawal of a standard for cause.

50.     For the NSF/ANSI 53 Standard in particular, NSF certified that the process complied with the ANSI Patent Policy at the time it was adopted on February 5, 2007.

51.     In addition to the actual requirements of NSF and ANSI, and their respective confirmed compliance with antitrust and other federal laws, it is generally well-known, and was known or should have been known by Brita, that SSOs operate under policies whereby patent disclosure is required.

**B. Brita participated in the NSF task groups involved in the adoption of the NSF/ANSI 53 Standard since at least 2005, yet deceptively failed to disclose its patents, patent applications, and intention to hold an essential patent.**

52.     Upon information and belief, Brita (through its representatives from Clorox) was a member of the NSF's Drinking Water Treatment Unit Joint Committee since at least 2004 and attended both the Gravity-Feed Lead Reduction Task Group and the Plumbed-In Task Group meetings beginning in at least March 2005 and participated in those task group meetings throughout the time period when those task groups considered the adoption of the NSF/ANSI 53 Standard through its adoption in February 2007.

53.     Upon information and belief, Brita (through its representatives from Clorox) began to attend the task group meetings to monitor developments in the proposed standard discussed by the water filter industry participants who contributed to the NSF and ANSI process.

54.     Specifically, Clorox employees Rick Nishijima, David Nelson and/or Jonathan McDonald each attended and participated in task group meetings in 2005 and 2006, representing Brita's interests.

55.     Those employees regularly participated in the task group meetings, offering opinions and information relevant to the adoption of the NSF/ANSI 53 Standard. In fact, Brita played a critical role in the task groups, conducting tests and providing laboratory services for the benefit of the task groups' consideration of the standard.

56.     Upon information and belief, from no later than 2005, Brita (through its representatives from Clorox) used its participation in NSF task groups to gain timely information about the proposed standard. Brita deceived NSF and ANSI by not disclosing its own patent rights, pending applications, intentions, and developing technology that implicated the proposed standard and would prevent other industry participants from meeting the standard.

57.     As a participant in the task forces that undertook a review of and proposed revisions to the standard, Brita (through its representatives from Clorox) had a continuing obligation to disclose the existence of its patent rights, pending applications, intentions and developing technology that implicated the proposed standard.

58.     Throughout 2005, 2006 and through the adoption of the NSF/ANSI 53 Standard in February 2007, the NSF task groups discussed and debated the parameters of the NSF/ANSI 53 Standard and the impact it would have on the industry. Brita participated in those task group meetings and discussions through its representatives from Clorox. At no time did Brita disclose the fact that it had patent rights, pending applications, and was currently developing technology that if patented, would be essential to the standard under consideration.

13

59.     Upon information and belief, when it joined and while it was a member of NSF, Brita was aware that it was NSF's policy to avoid inclusion of patented technology (or technology to be patented) in an NSF standard unless the committee charged with development of the standard had sufficient information about the patent involved (or intention to patent) such that the committee could make an informed decision whether the patented technology was sufficiently important and valuable to justify inclusion in the standard.

60.     Upon information and belief, when it joined and while it participated in the NSF task groups, Brita was also aware that each member of an SSO like NSF is subject to an obligation under the antitrust laws not to use the privilege of membership in such organization to engage in anticompetitive conduct.

61.     Upon information and belief, when it joined and while it was a member of NSF, Brita was aware that members of NSF considered each member subject to a duty of good faith and fair dealing with respect to standard setting, including a duty of good faith and fair dealing regarding disclosures of intellectual property rights that might affect the competitive consequence of an NSF standard.

62.     Upon information and belief, when it joined and while it was a member of NSF, Brita was aware that one reason for NSF's policy concerning inclusion of patents was to preclude use of the privilege of joint standard setting for anticompetitive purposes.

63.     Upon information and belief, when it joined and while it was a member of NSF, Brita was aware that NSF's practical objective regarding the NSF/ANSI 53 Standard was to enable the industry to formulate standards that sufficiently addressed the "health effects" of filtered water while meeting market needs in terms of performance and cost.

64.     Despite its knowledge of NSF's and ANSI's policies, its understanding of the overall goals and objectives of NSF and its understanding of the antitrust laws and its duty of good faith and fair dealing with respect to standard setting, Brita engaged in deception and failed to fulfill its obligations to disclose its relevant patents, patent applications, and intentions for the same, both prior to the adoption of the NSF/ANSI 53 Standard and repeatedly after the standard was adopted.

65.     Through its participation in the NSF task force meetings, Brita was aware that certification under the proposed standard would be required for the commercial success of high-performance gravity-fed water filter products.

66.     In May and October 2006, the Joint Committee solicited votes and comments from members regarding the then-draft of the NSF/ANSI 53 Standard. Brita (through its Clorox representative James Mitchell) voted "No" and provided comments supporting Brita's "No" vote. Upon information and belief, Brita's stated reasons for its "No" vote were pretext, as there were indications that the standard would be enacted irrespective of Brita's vote. Furthermore, while at the time Brita intended to hold a patent essential to the standard, Brita did not yet have an actual product that could meet the standard as drafted.

67.     When the standard was adopted in February 2007, Brita still did not disclose its patent rights, pending patent applications, and/or related intentions.

68.     Indeed, Brita (through its Clorox representatives), continued to participate in NSF task groups evaluating revisions to the NSF/ANSI 53 Standard in at least 2011 and 2012 and through the time the '141 Patent issued in 2012. Yet, Brita continued to keep its now-issued patent rights a secret, in violation of the NSF's and ANSI's continued obligation to disclose patent rights, applications, and intentions essential to the standard.

69.     Brita deliberately deceived other high-performance gravity-fed water filter product manufacturers about its intellectual property rights or applications relevant or related to the NSF standard. Brita recognized that its ongoing deception until the industry became "locked in," would ensure Brita could acquire monopoly power. The deception also prevented other competing manufacturers, including ZeroWater, from exploring and developing alternative products—which, upon information and belief, they would have done but for Brita's ongoing deception.

70.     Upon information and belief, to this day, Brita has still not formally disclosed the existence of its '141 Patent to NSF or ANSI because it knows disclosure was required long ago and that NSF and ANSI have the ability to withdraw entirely or modify the standard.

71.     ZeroWater became aware of the '141 Patent's impact on industry participant's ability to meet the NSF/ANSI 53 Standard only when Brita filed its Delaware and ITC Actions against it in December 2021.

## C. At the time it participated in the NSF task forces, Brita was developing technology and/or formulas that, if patented, would be essential to the NSF/ANSI 53 Standard.

72.     The '141 patent is entitled "Gravity Flow Filter" and was filed on September 9, 2008 as U.S. Patent Application No. 12/207,484. At least as noted on the face of the '141 Patent, it issued from U.S. Patent Application Nos. 11/927,372 and 11/858,765, filed September 20, 2007 and October 29, 2007, respectively. The '372 Application is a continuation in part of U.S. Patent Application No. 10/881,517 filed June 30, 2004, and the '765 Application is a continuation in part of Patent Application No. 60/846,162, filed September 20, 2006.[1] Brita alleges it owns by assignment all rights, titles and interests, in and to the '141 patent.

_____

[1] For purposes of this Complaint, ZeroWater's allegations concerning the '141 Patent and its history are based on the information contained in the '141 Patent itself. ZeroWater believes the '141 Patent is invalid and that Brita has mischaracterized its patents prior and related to the

73.     While Brita was developing, refining, and/or applying for these patents, it knew

about the consideration of the NSF/ANSI 53 Standard and, upon information and belief,

implemented its patent strategy with the goal of excluding other market participants from being

able to meet the standard without licensing or infringing upon Brita's patent.

74.     Specifically, the Brita and/or Clorox employees who participated in the NSF task

groups developing the NSF/ANSI 53 Standard were aware at the time of their participation of

Brita's patents, applications, and intentions regarding patent rights that impact the standard.

75.     The '141 Patent was issued by the United States Patent and Trademark Office on

May 1, 2012 to co-inventors Elizabeth L. Knipmeyer, Toni L. Lynch, Roger P. Reid, and Bruce

D. Saaski. Brita alleges it is the owner by assignment of the '141 Patent. All four of the prior

patent applications in Brita's portfolio cited on the face of the '141 Patent have at least one of the

'141 Patent inventors listed as inventors.

76.     Claim 1 of the '141 Patent claims the following: "A gravity-fed water filter,

comprising: filter media including at least activated carbon and a lead scavenger; wherein the

filter achieves a Filter Rate and Performance ("FRAP") factor of about 350 or less according to

the following formula:

$$FRAP = [V * f * c_e]/[L * 2]$$

Where: $V$ = volume of the filter media (cm$^3$), $f$ = average filtration unit time over lifetime L

(min/liter), $c_e$ = effluent lead concentration at end of lifetime L when source water having a pH of

8.5 contains 90-120 ppb (μg/liter) soluble lead and 30-60 ppb (μg/liter) colloidal lead greater

than 0.1 μm in diameter, and $L$ = filter usage lifetime claimed by a manufacturer or seller of the

---

'141 Patent. Relevant here is that, taking Brita's own view as true, its patent disclosure
obligations arose well before the Health Effects Standard went into effect.

filter (gallons)." Brita's D.Del. Complaint for Patent Infringement ("Brita D.Del. Compl.") ¶ 18; *see also* Brita's ITC Complaint ("Brita ITC Compl.") ¶¶ 57-59.

77.    Brita claims the '141 patent is generally "directed to gravity-fed filters that have rapid flow rates and excellent lead filtration performance" and that "[t]he described filters meet a specific performance rate of operation defined by filter volume, defined usage lifetime, average time of filtration, and/or lead reduction ability." *Id.* ¶ 57. That is, FRAP Factor, defined above, is the sole metric used to define high-performance gravity-fed water filter products that are allegedly covered by the '141 patent. *Id.* In particular the '141 Patent is directed towards reducing the lead contaminant in drinking water. But, as is evident from review of the '141 Patent claims, the patent does not actually claim how to create filters that might satisfy the aspirational FRAP Factor.

78.    Specifically, Brita alleges that Claim 1 of the '141 Patent claims gravity-fed water filters that comprise activated carbon, a lead scavenger, and have a FRAP factor below 350. *Id.* ¶ 59.

79.    The '141 Patent itself *expressly incorporates* the NSF/ANSI 53 Standard. By example, the '141 Patent states "FRAP performance testing may be conducted according to the NSF/ANSI 53 protocol. Requirements and procedures of the NSF/ANSI 53 protocol are available in a document entitled 'Drinking water treatment units—Health effects' available from NSF International . . . which is herein incorporated by reference." '141 Patent at 26.

80.    Further, the '141 Patent states that the patented technology, "ha[s] been found to perform effectively in water filtration, including obtaining lead removal results that meet the recent NSF Standard 53 for lead in drinking water (less than 10 ppb lead, that is less than 10 ppb

total of soluble and particulate lead), while also achieving a flow rate of 1 liter per 4-7 minutes flow rate of water filtration." *Id.* at 23.

81.     In addition, the '141 Patent states that "[p]referably, the source water is prepared as defined in the NSF/ANSI 53 protocol (2007)." *Id.* at 25.

82.     Statements that Brita has made in documents publicly filed in its ITC Action against its competitors for alleged infringement confirm that the NSF/ANSI 53 Standard is incorporated in the '141 Patent and that the patent's terms should be construed in accordance with that standard. *See* ITC Action, Brita's Opening Claim Construction Brief at 15 ("With respect to validation of lead reduction performance and lifetime, the industry standard is provided by NSF/ANSI 53. While the NSF/ANSI 53 standard is periodically updated or modified, at the time of the '141 Patent, the operative version of this standard was the 2007 edition, and the '141 Patent incorporates this standard by reference for purposes of FRAP performance testing. Therefore, the NSF/ANSI (2007) standard is intrinsic evidence that may be used to understand the claim language.") (citations omitted).

83.     Brita also claims that it "discovered and developed a new class of gravity-fed water filters that improve water safety by enhancing removal of soluble and colloidal lead from drinking water while at the same time achieving fast flow rates suitable and desirable for a home water filtration system" and that "[p]rior art gravity-fed water filters did not achieve these objectives and could not meet the more stringent ANSI/NSF standards for lead removal adopted in 2007 without making substantial sacrifices on size, service life, and flow rate." Brita ITC Compl. ¶ 56. Accordingly, Brita essentially admits that what is unique about its '141 Patent is that it has the ability to meet the NSF/ANSI 53 Standard.

84. Thus, through its alleged creation of the unremarkable performance metric equation for filter performance (FRAP), Brita's '141 Patent claims to cover any and all filters that perform to a certain well-known set of criteria such as flow rate and volume of filter media that meets the NSF/ANSI 53 Standard.

85. Moreover, the Administrative Law Judge currently presiding over the ITC Action, in her Order relating to claim construction, adopted Brita's urging that the NSF/ANSI 53 Standard informs the claim language. *See* ITC Order dated July 20, 2022 at 15, made public on August 11, 2022 ("The '141 patent describes the NSF/ANSI 53 standard, where it can be located, and the purpose of incorporating by reference to provide 'FRAP performance testing' that may use the 'requirements and procedures' of the standard to calculate the lifetime as part of the FRAP formula.").

86. By Brita's own admissions, the '141 Patent is essential to the NSF/ANSI 53 Standard, and its intention in holding the '141 Patent was and is to preclude its competitors from meeting the standard and obtaining the certification required for marketability of high-performance gravity-fed water filter products, which is, in effect, to preclude its competitors from offering products that make water safe to drink.

87. The claims in the '141 Patent preclude Brita's competitors from marketing a commercially viable high-performance gravity-fed water filter that can both be NSF-certified under the NSF/ANSI 53 Standard, that is, make certain health related claims that are critical to marketing in the industry, and not allegedly infringing upon the '141 Patent.

88. Indeed, Brita publicly admits that the class of filters invented and claimed in the '141 Patent achieve high-quality performance standards in four key areas: (1) removal of both soluble and particulate (colloidal) lead in compliance with industry standards (*i.e.*, NSF/ANSI

Standard 53 (2007)), (2) high filter flow rate to satisfy consumer expectations, (3) a long filter

lifetime, and (4) they achieved the previous attributes within a reasonably confined volume (*i.e.*,

most consumers need to store their gravity-fed systems in the refrigerator)." Brita's Opening

Claim Construction Brief at 3.

89.     Brita further admits that features of high-performance gravity-fed water filter

products like being "compact, work[ing] quickly, remov[ing] contaminants, and produc[ing]

great tasting water" are "important to customers." Brita ITC Complaint ¶ 17.

90.     Brita admits that "[g]iven the importance of a filter lifetime or capacity, it is

unsurprising that it also pervades the NSF/ANSI 53 standard itself. NSF/ANSI 53 references a

'rated service life' or 'capacity' for a filter, which the manufacturer is required to provide."

Brita's Opening Claim Construction Brief at 16.

91.     Accordingly, Brita in effect alleges that the '141 Patent gives it power to block

any gravity-fed water filter that complies with the applicable NSF standard from the U.S. market

for those products.

92.     Further, manufacturers and sellers of water filters routinely certify their

performance claims under NSF/ANSI 53, in part, because these certifications are *required* to sell

a water filter in certain states, such as Iowa and California. *See* Iowa Administrative Code

Chapter 14; California Health and Safety Code § 116825.). Thus, by precluding such

certification, the '141 Patent renders competing water filter products unable to be marketed in

those states.

93.     Even where states do not require certification under the applicable NSF/ANSI

Standard, manufacturers and sellers often obtain such certifications because, under the FTC Act,

health and safety claims must be supported by "competent and reliable scientific evidence" and the certification provides that authority.

94.     The ability to advertise compliance with the applicable NSF/ANSI Standard is critical to the industry. That is, without certification, a high-performance gravity-fed water filter seller cannot make any lead removal or similar claims and cannot use the NSF banner in connection with those claims, which has become the seal of approval for these products. Without the ability to make such claims or use the NSF banner, Brita's rivals would be unable to expand into new retailers and would be at risk of losing their current customers (retailers and end users).

**D. Brita waited until the industry was "locked in" to the technology covered by its essential patent claims through the NSF/ANSI 53 Standard and then moved to enforce its alleged patent rights through litigation.**

95.     As discussed above, Brita (through its representatives at Clorox) made itself aware of NSF's consideration of a new standard as early as 2005 when it began participating in NSF task force meetings. Brita was intimately involved with the standard-setting process through, including, and after the adoption of the NSF/ANSI 53 Standard in February 2007.

96.     As described above, throughout that time, Brita had an intention to and was pursuing patent rights essential to that standard. By Brita's own account (which ZeroWater disputes as an improper attempt to gain an earlier "priority date"), the '141 Patent issued from prior patent applications that were a continuation of patent applications dating back to at least June 30, 2004.

97.     Further, the '141 Patent was filed only after Brita personnel developed knowledge regarding changes in the applicable NSF/ANSI 53 Standard.

98.     By the time the '141 Patent was issued in 2012, the industry was "locked in" to the NSF/ANSI 53 Standard.

99.     At that time, ZeroWater had products that were certified under the NSF/ANSI 53 Standard.

100.     Specifically, ZeroWater sells, among other products, the following water filtration products that are certified under the NSF/ANSI 53 Standard: ZeroWater 5-Stage Filters and ZeroWater containers sold with such filters, including the ZeroWater Ready-Pour Water Filter Pitchers and Dispensers, the Water Cooler Filtration System, the 40 Cup Ready-Pour Glass Water Dispenser, and the 8 Cup Round Water Pitcher (collectively, "ZeroWater's Water Filtration Products").

101.     ZeroWater's product is currently the *only* high-performance gravity-fed water filter that has been certified under the NSF/ANSI 53 Standard's PFOA/PFOS, lead, and chromium reduction claims.  A recent EPA advisory indicates that some negative health effects may occur from drinking water, with concentrations of the chemical group PFOA/PFOS that are even near zero. Therefore, Brita's anticompetitive conduct prevents consumers from accessing the only product that effectively eliminates the dangers of PFOA/PFOS, lead, and chromium.

102.     Despite its patent issuing in 2012, Brita continued deceiving the industry for almost a decade, until December 23, 2021, before asserting its patent rights through litigation. Having waited until its other rivals had expended resources on, marketed and sold products that had been certified under the standard enacted in 2007, Brita's legal actions could now be brought against *every single one of its competitors certified under the NSF/ANSI 53 standard selling products in the United States*, and claim damages going back several years.

103.     On December 23, 2021, Brita filed its complaint for patent infringement in the United States District Court for the District of Delaware alleging that ZeroWater's Water

Filtration Products infringe upon Brita LP's '141 Patent. *See* D.Del., ECF No. 1 ("Brita D.Del. Compl.").

104.    In particular, Brita alleged that ZeroWater's Water Filtration Products "include activated carbon and a lead scavenger" and "achieve a FRAP factor, as defined in the '141 Patent, of about 350 or less" and thus, "directly infringe at least Claim 1 of the '141 patent, either literally or under the doctrine of equivalents[.]" Brita D.Del. Compl. ¶¶ 22-24.

105.    Also on December 23, 2021, Brita filed its ITC Action against EcoLife Technologies, Inc., Quingdao EcoPure Filter Co., Ltd., Kaz USA, Inc., Helen of Troy Limited, Zero Technologies, LLC, Culligan International Co., Vestergaard Frandsen Inc., Mavea LLC, and Brita GmbH (the "ITC Defendants") alleging that "certain gravity-fed water filters and products containing the same infringe the '141 patent[,]" specifically, Claim 1. Brita ITC Compl. ¶ 2. Brita alleges that each of the ITC Defendants imports or sells products that infringe the '141 patent. *Id.* ¶¶ 6-10, 69-74.

106.    In its ITC Complaint, Brita seeks relief including that the ITC: (a) institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to Respondents' violations of that section arising from the importation into the United States, sale for importation, and/or the sale within the United States after importation of high-performance gravity-fed water filters and products containing the same, that infringe one or more claims of the '141 Patent; (b) schedule and conduct a hearing pursuant to Section 337(c) for the purposes of (i) receiving evidence and hearing argument concerning whether there has been a violation of Section 337, and (ii) following the hearing, determining that there has been a violation of Section 337; (c) issue a permanent limited exclusion order directed to products manufactured, imported, sold for importation and/or sold after importation by or on behalf of

"requests that the United States International Trade Commission institute an investigation into Respondents, their subsidiaries, related companies, and agents pursuant to 19 U.S.C. § 1337(d) excluding entry into the United States of high-performance gravity-fed water filters and products containing the same, that infringe one or more claims of the '141 Patent; (d) issue permanent cease and desist orders pursuant to 19 U.S.C. § 1337(f) prohibiting Respondents, their domestic subsidiaries, related companies, and agents from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, use after importation, sale after importation, and other transfer within the United States of high-performance gravity-fed water filters and products containing the same, that infringe one or more claims of the '141 Patent; (e) impose a bond upon importation of high-performance gravity-fed water filters and products containing the same, that infringe one or more claims of the '141 Patent, during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j); and (f) Issue such other and further relief as the Commission deems just and proper under the law, based on the facts determined by the investigation and the authority of the Commission. *Id.* ¶ 130; *see also*, *id.* ¶¶ 1, 13-15.

107.    In response to the ITC Complaint, ZeroWater has publicly stated that it denies "that the '141 Patent is valid, enforceable and infringed." ITC Action, ZeroWater Response ¶ 2. In addition, ZeroWater asserted the following defenses in the ITC Action: Noninfringement, Invalidity, Unenforceability, Lack of Domestic Industry, No Importation, Relief not in Public Interest. ZeroWater Response, Defenses ¶¶ 1-21.

E.  **Had NSF been made aware of Brita's patent rights, applications, and intentions, NSF would not have adopted the standard in the form that it did, and if Brita's rivals had known about the patent rights, they would have expended their resources to develop different competing products.**

108.   Brita's deception in the face of its obligation to disclose its patent rights, applications, and intentions deliberately created the impression among NSF members and other participants in the market for high-performance gravity-fed water filters that the standard being considered would not be impacted by any undisclosed claims.

109.   Upon information and belief, had Brita disclosed the existence of its patent rights, applications, and related intentions that impacted the NSF/ANSI 53 standard, NSF would not have adopted the standard in the form that it did.

110.   By deceiving NSF and ANSI and failing to disclose its patent rights, patent applications, and intention to hold a patent essential to the standard, Brita deprived NSF and industry participants from the ability to protect the market from Brita's ability to acquire monopoly power through the patent hold up Brita is now forcing on the market for high-performance gravity-fed water filters.

111.   Further, the ANSI Guidelines makes clear that "subsequently discovered patents" could lead to "withdrawal of ANSI's approval of the standard as an American National Standard." §III.C.

112.   Accordingly, Brita's failure to disclose its patent rights to NSF puts the entire standard in jeopardy and possibly impacts NSF's consideration of amendments to the NSF/ANSI 53 Standard and adoption of future standards.

113.   ZeroWater, and other Brita competitors, reasonably relied upon Brita's silence during and after the adoption of the NSF/ANSI 53 Standard to make significant investments in, *inter alia,* its own product certification.

114.   ZeroWater reasonably relied on that deliberate impression created by Brita diverting resources towards certain investments in its business.

115.   In 2006, ZeroWater began testing its products in accordance with the then-known requirements of the NSF/ANSI 53 Standard. At that time, like other industry participants, ZeroWater did not know that Brita owned or was pursuing patent claims that were essential to the standard.

116.   In 2007, ZeroWater first submitted its products for certification under the NSF/ANSI 53 Standard. ZeroWater knew that certification under the NSF/ANSI 53 Standard was critical to its marketing of its high-performance gravity-fed water filter products.

117.   NSF requires that products be re-submitted for certification every five (5) years.

118.   The process for obtaining certification by NSF is expensive and requires significant resources. In fact, ZeroWater has a department responsible for the certification of ZeroWater's products, which has included up to 25 employees.

119.   Further, to ensure that it will pass NSF's testing requirements, ZeroWater often seeks out testing by other third-parties before seeking to obtain certification by NSF.

120.   ZeroWater has invested significant and valuable time, resources, and money to obtain and maintain NSF certification for its products.

121.   Other competitors of Brita in the high-performance gravity-fed water filter product market have undoubtedly made similar investments.

122.   But for Brita's ongoing deception, even after the NSF/ANSI 53 Standard was adopted, Brita's competitors would not have used the same level of resources it did in developing products, obtaining NSF certification (and recertification), and marketing their products. Brita's competitors, including ZeroWater, upon information and belief, would have redeployed their

resources elsewhere. Brita's ongoing deception prevented its competitors from developing alternative products and allowed Brita to further insulate itself from competition.

## V.    THE RELEVANT MARKET

123.    The relevant market for purposes of the antitrust claims in this action is the market for high-performance gravity-fed water filter products certified to the NSF/ANSI 53 standard (the "certified-product market").

124.    The geographic market is the United States.

125.    The certified-product market is substantial and affects interstate commerce.

126.    The United States market is a significant and important market for ZeroWater and its products to be competitive.

127.    The certified-product market has certain barriers to entry, including the significant costs and resources associated with obtaining the critical NSF certification required to make contaminant reduction claims.

128.    As discussed above, Brita accuses each of the ITC Defendants, which includes ZeroWater, of producing, importing, or selling products that infringe on the '141 patent. The allegedly infringing products, according to Brita, include the following high-performance gravity-fed water filter products, "Aqua Crest AQK-06L Replacement Pitcher Water Filters for the Aqua Crest Group; the Pur Plus Pitcher Filters and Pur Plus Pitchers for the Pur Group; the ZeroWater 5-Stage Replacement Filters and ZeroWater Ready-Pour Water Pitchers for the ZeroWater Group; the LifeStraw Home Full Replacement Filters and LifeStraw Home Pitchers for the LifeStraw Respondent; and the Kirkland Signature Water Filter and Kirkland Signature Filtered Water Pitcher for the Mavea Group." Brita ITC Compl. ¶ 50.

129.    Brita claims that the allegedly infringing products "meet a combination of high-performance criteria relating to filter rate and lead volume, lead reduction, and lifetime usage, and water container products that are sold with such filters." *Id.* ¶ 49.

130.    Brita's products that fall under these categories are "the LongLast and LongLast+ filters and containers that use the same, including but not limited to: the Metro/SoHo, Ultramax Jet Black, Space Saver, Amalfi, Grand Color Series, Pacifica, Capri, Mini Plus, Marina, Monterey, Wave, and Everyday pitcher and dispenser systems." *Id.* ¶ 19. *See also*, *id.* ¶ 20; 119-123.

131.    Brita admits that ZeroWater's Water Filtration Products are sold within the same product and geographic market as Brita's Water Filtration Products. (*See* Brita D.Del. Compl. ¶ 27 ("But for [ZeroWater's] infringing conduct in selling the [ZeroWater Water Filtration Products], the Brita product would have made the sales that were made by [ZeroWater]."); Brita ITC Compl. ¶ 20 (defining the "domestic industry" as the United States).

132.    In fact, Brita appears to argue that any product that "market[s] the lead reduction features claimed in the '141 patent" are products within the same market as Brita's Water Filtration Products and a source of potential "price erosion, lost profits, and loss of market share for Brita." Brita D.Del Compl. ¶ 28. That is, any product that makes a lead reduction claim that meets the NSF/ANSI 53 Standard allegedly infringes Brita's '141 Patent.

133.    By Brita's own public admissions, it has acquired substantial market power in the relevant market in the United States. Brita has claimed in its public filings in the ITC Action and in its own marketing materials that:

        a.    Brita is America's #1 brand of water filtration and is a leader in the consumer water filter product market. *See* Brita ITC Compl. ¶ 17.

b.  Brita claims it was the first company to offer water filter products that are compact, work quickly and remove contaminants. *Id.*

c.  Brita claims its water filters are certified under the NSF/ANSI 53 Standard to reduce lead, mercury, cadmium, benzene and asbestos.

d.  "It is [Brita's] objective to maintain our position as one of the world's leading experts in the optimization and individualization of drinking water and thus to create lasting added value for our consumers, customers, staff, business partners and the companies that build the BRITA Group."

e.  Brita claims that its name is "synonymous with water filters."

f.  Brita claims it is "the only global brand in its particular segment."

## COUNT I – MONOPOLIZATION

134.  ZeroWater incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

135.  Defendants' anticompetitive conduct set forth in this Complaint has violated Section 2 of the Sherman Act. *See* 15 U.S.C. § 2.

136.  Defendants have unlawfully monopolized the relevant market by deliberately and deceptively failing to disclose their patent rights, applications, and related intentions essential to the NSF/ANSI 53 Standard. This conduct violated the policies of NSF and ANSI and the antitrust laws.

137.  Defendants' non-disclosure of their patent rights, applications, and related intentions proximately resulted in adoption of the NSF/ANSI 53 Standard over which Defendants claim patent rights.

138.  Had Defendants properly disclosed their patent rights, applications, and related intentions, NSF would not have adopted the standard in the form that it did.

139.     Defendants have further unlawfully monopolized the relevant market by intentionally using its membership and participation in NSF task groups to learn about the proposed, and eventually adopted, standard, and formulated its patent strategy so that it could later block other industry participants from becoming certified under the standard after they had become "locked in" to the standard.

140.     By continuing its deception and asserting its patent rights after the industry became "locked in," Defendants have unlawfully excluded competing technologies from the relevant market and unlawfully acquired monopoly power in that market. But for Defendants' deception, their competitors may have redeployed their resources elsewhere—potentially developing products that would have constrained Defendants' ability to acquire market power.

141.     At the time of the anticompetitive actions complained of herein, the relevant product market was the certified-product market, and the relevant geographic market was the United States.

142.     As a result, ZeroWater suffered antitrust injury, including in the form of significant resources expended to, *inter alia,* obtain and maintain certification under the standard and market its products as certified under the standard, while refraining from investing in and developing new alternative technologies, all while Defendants deceptively failed to disclose their patent rights, applications and intentions in violation of NSF and ANSI policies and the antitrust laws and lied in wait to execute their patent "ambush." Defendants acquired monopoly power through their deception and "ambush." ZeroWater has also suffered loss of profits, loss of customers and potential customers, and loss of goodwill and product image as a result of Brita's conduct alleged herein.  In addition, because Defendants have abused their wrongfully acquired

monopoly power, ZeroWater has been forced to expend significant resources and incur substantial costs, including attorneys' fees and other expenses.

143.    In addition, consumers of products in the relevant markets are harmed because Brita has the ability to charge monopoly prices and discourage new market entrants for products that are favored due to their lower cost and portability. In addition, Brita's anticompetitive product will preclude ZeroWater's product from the market, which is the *only* high-performance gravity-fed water filter that has been certified under the NSF/ANSI 53 Standard's PFOA/PFOS, lead, and chromium reduction claims.

144.    Consumers of products in the relevant market are also harmed because, in addition to the natural barriers to entry into that market, Brita's anticompetitive conduct is intended to and/or does in fact discourage new companies from entering and competing in that market. Those consumers are further harmed because Brita's anticompetitive conduct is intended to and/or does in fact inhibit innovation in products that provide affordable, safe drinking water, both by current competitors in the relevant market and potential new entrants into it.

145.    The full amount of damages incurred by ZeroWater as a result of Defendants' actions complained of herein remains to be determined.

**COUNT II – ATTEMPTED MONOPOLIZATION**

146.    ZeroWater incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

147.    Defendants have attempted to monopolize the relevant market in violation of Section 2 of the Sherman Act based on the anticompetitive conduct described herein.

148.    Defendants have a specific intent to monopolize the relevant market. As discussed in more detail above, Defendants specifically intend to block any other company from selling NSF-certified high-performance gravity-fed water filters in the United States through its

enforcement of its patent claims essential to the NSF/ANSI 53 Standard. In doing so, Defendants attempted to control high prices in the relevant market and to exclude competition. This is particularly egregious given that the products at issue are favored due to their lower cost and portability.

149.    Through the anticompetitive, deceptive, and intentional acts described above, Defendants achieved a dangerous probability of success of monopolizing the relevant market. By deceiving NSF, using its membership and participation to formulate and execute its patent "ambush," and then later enforcing its alleged rights to a patent essential to the NSF/ANSI 53 Standard after the industry was "locked in" to the standard, Defendants intended to acquire monopoly power over high-performance gravity-fed water filter products in the United States. Defendants intended to exclude other market participants through blocking their use of the essential patent and therefore precluding their certification under the standard and ability to make certain health claims critical to marketing the relevant product.

150.    As a result, ZeroWater suffered antitrust injury, including in the form of significant resources expended to, inter alia, obtain and maintain certification under the standard and market its products as certified under the standard, while refraining from investing in and developing new alternative technologies, all while Defendants deceptively failed to disclose their patent rights, applications and intentions in violation of NSF and ANSI policies and the antitrust laws and lied in wait to execute their patent "ambush." Defendants acquired monopoly power through their deception and "ambush." ZeroWater has also suffered loss of profits, loss of customers and potential customers, and loss of goodwill and product image as a result of Brita's conduct alleged herein. In addition, because Defendants have abused their wrongfully acquired

monopoly power, ZeroWater has been forced to expend significant resources and incur substantial costs, including attorneys' fees and other expenses.

151.    In addition, consumers of products in the relevant markets will be harmed because Brita has the ability to charge monopoly prices and discourage new market entrants for products that are favored due to their lower cost and portability. In addition, Brita's anticompetitive product will preclude ZeroWater's product from the market, which is the only high-performance gravity-fed water filter that has been certified under the NSF/ANSI 53 Standard's PFOA/PFOS, lead, and chromium reduction claims.

152.    Consumers of products in the relevant market will also be harmed because, in addition to the natural barriers to entry into that market, Brita's anticompetitive conduct is intended to and/or does in fact discourage new companies from entering and competing in that market. Those consumers are further harmed in that Brita's anticompetitive conduct is intended to and/or does in fact inhibit innovation in products that provide affordable, safe drinking water, both by current competitors in the relevant market and potential new entrants into it.

153.    The full amount of damages incurred by ZeroWater as a result of Defendants' actions complained of herein remains to be determined.

### COUNT III – UNFAIR COMPETITION

154.    ZeroWater incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

155.    Defendants have, as described above, engaged in intentional and deceptive conduct that is contrary to honest commercial practice and has, therefore, engaged in unfair competition in violation of the common law of Pennsylvania.

156. Defendants' actions were calculated to procure an unfair competitive advantage for Brita through improper means, including deceptive and unfair conduct as set forth in this Complaint.

157. Defendants have engaged in the intentional actions set forth in this Complaint willfully and deliberately and their conduct has caused injury to ZeroWater as well as to competition and the public as set forth in this Complaint.

158. The anticompetitive effects of Defendants' conduct are not outweighed by any procompetitive justification.

159. The full amount of damages incurred by ZeroWater as a result of Defendants' actions complained of herein remains to be determined.

**COUNT IV – BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)**

160. ZeroWater incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

161. Defendants entered into express or implied contractual commitments with NSF and its members and affiliates relating to the NSF/ANSI 53 Standard.

162. Each third party that would potentially seek certification and promote its products as in compliance with the NSF/ANSI 53 Standard was an intended beneficiary of these contracts.

163. ZeroWater has obtained certification of its products under the NSF/ANSI 53 Standard and has made health claims under that standard that are critical to the marketing of those certified products.

164. Defendants were contractually obligated, among other things, to comply with the antitrust laws and disclose their patent rights, applications, and intentions consistent with the policies of NSF and ANSI, the antitrust laws, and the common law obligations imposed on members of SSOs.

165.    Defendants breached their contractual obligations by failing to disclose their patent rights, applications, and intentions to NSF.

166.    Defendants further breached their contractual obligations by using their membership and participation in NSF task groups to formulate its patent strategy intended to block industry participants from becoming certified under the standard and making certain health claims critical to marketing the relevant product.

167.    ZeroWater will suffer irreparable injury by reason of the acts, practices and conduct of Defendants alleged above unless and until the Court enjoins such acts, practices and conduct.

168.    The full amount of damages incurred by ZeroWater as a result of Defendants' actions complained of herein remains to be determined.

**COUNT V – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

169.    ZeroWater incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

170.    Each of the express or implied contractual commitments Defendants entered into with NSF and its members and affiliates relating to the NSF/ANSI 53 Standard contain a covenant of good faith and fair dealing that requires Defendants to exercise good faith in its contractual obligations.

171.    Defendants breached their obligation to act with good faith by failing to disclose their patent rights, applications, and intentions to NSF in violation of NSF and ANSI's policies and the antitrust laws, as part of their patent strategy intended to block industry participants from becoming certified under the standard and making certain health claims critical to market the relevant product.

172.    The full amount of damages incurred by ZeroWater as a result of Defendants'

actions complained of herein remains to be determined.

## PRAYER FOR RELIEF

WHEREFORE, ZeroWater respectfully requests that this Court enter judgment in

Plaintiff's favor and against Defendants and grant relief as follows:

### Preliminary and Permanent Injunctive Relief

a.    An order requiring Brita to disclose the '141 Patent as essential to the NSF/ANSI

    53 Standard to NSF and ANSI.

b.    The entry of a consent order preliminarily and permanently enjoining Brita from

    any further exclusionary, predatory, or anticompetitive acts as described above,

    subject to the continuous jurisdiction of this Court to enforce its terms.

c.    An order preliminarily and permanently enjoining Brita from any further unfair,

    unlawful, and/or deceptive conduct as described above.

### Damages and Other Relief

d.    Award ZeroWater's treble damages for Brita's conduct in violation of the

    Sherman Act.

e.    Award ZeroWater compensatory damages for Brita's unfair conduct and conduct

    in breach of contract and the covenant of good faith and fair dealing.

f.    Award ZeroWater punitive damages based on Brita's outrageous conduct and/or

    reckless indifference to ZeroWater's rights and Brita's obligations.

g.    Award ZeroWater its reasonable costs (including expert witness fees) and

    attorneys' fees.

h.    Award ZeroWater pre-judgment interest at the maximum rate allowed by law,

    calculated from the date of service of this Complaint on Brita.

      i.    Award ZeroWater post-judgment interest as provided by law from the date of

judgment until paid.

      j.    Award such other or further relief in favor of ZeroWater that the Court deems

proper and just under the circumstances.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ZeroWater demands trial by

jury in this action of all issues so triable.

Dated: October 6, 2022

BAKER & HOSTETLER LLP

 /s/ *Carl W. Hittinger*
Carl W. Hittinger (PA 30250)
Julian D. Perlman (PA 326602)
Alyse F. Stach (PA 328562)
1735 Market Street – Suite 3300
Philadelphia, PA  19103-7501
T: (215) 564.2898
F: (215) 568.3439
chittinger@bakerlaw.com
jperlman@bakerlaw.com
astach@bakerlaw.com

*Counsel for Plaintiff*
*Zero Technologies, LLC*

## **VERIFICATION**

In accordance with 28 U.S.C. § 1746, I certify that I am the CEO of ZeroWater, and I verify under penalty of perjury that the factual averments of the foregoing Verified Complaint, to the extent they are within my personal knowledge, are true and correct to the best of my knowledge and belief.

Dated: October 6, 2022

Doug Kellam