**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ZERO TECHNOLOGIES, LLC,** <br> **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **THE CLOROX COMPANY and** <br> **BRITA, LP,** <br> **Defendants.** | **NO.  22-3989** |

**MEMORANDUM**

**J. HODGE, K.**                                             **January 29, 2024**

Plaintiff Zero Technologies, LLC ("ZeroWater") and Defendants Brita, LP and its parent company, The Clorox Company, (collectively "Brita") are competitors who make home water-filtration products that they market as being capable of removing harmful contaminants from consumers' water supply.  Both have had their products in the stream of commerce for over a decade.  (ECF No. 1 at 5; ECF No. 7; ECF No. 25 at 13.)[1]  But after years of competition, the parties have now entered into litigation, with actions being brought in three different forums, including in this Court, the United States District Court for the District of Delaware ("District of Delaware"), and before the United States International Trade Commission ("ITC").  *See Brita LP v. Zero Technologies LLC*, 1:21-cv-01801 (D. Del. Dec. 23, 2021) ("Delaware Action"); *In the Matter of Certain High-Performance Gravity-Fed Water Filters and Products Containing the Same*, Investigation No. 337-TA-1294 ("ITC Action").

On October 6, 2022, ZeroWater brought the present antitrust action in this Court against Brita alleging violations of the Sherman Act, 15 U.S.C. § 2, along with state law claims for unfair

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

competition, breach of express or implied contract, and breach of the covenant of good faith and fair dealing. (ECF No. 1.) ZeroWater's position is that Brita has launched a corporate turf war through its "decades-long scheme to obtain a stranglehold" on high-performance gravity-fed water filters. (ECF No. 25 at 8.) Brita's agenda, according to ZeroWater, is to unlawfully acquire a monopoly and either force ZeroWater and other competitors out of business or pay Brita exorbitant licensing fees. (ECF No. 1 at 14, 33, 35; ECF No. 25 at 14.) ZeroWater claims Brita's actions not only pose an "existential threat to shut down . . . [ZeroWater's] entire business in the U.S.," but also harms consumers who, consequently, may be denied access to the only home products certified to remove a combination of certain harmful water contaminants. (ECF No. 39 at 51-52; ECF No. 1 at 7.) ZeroWater argues that the public health consequences are particularly acute because "[i]n many places throughout the country, including this District, high-performance gravity-fed water filters can be the only affordable source of safe, clean drinking water." (ECF No. 25 at 8.)

Brita, in contrast, contends that it is enforcing its legitimate intellectual property rights in a patent it owns, which is referred to in the parties' briefs as "the '141 Patent." Brita states that it sued to defend these intellectual property rights in the District of Delaware and in the ITC in 2021 when it discovered that ZeroWater and other competitors were selling similar gravity-fed water filters and well before this present action was filed. (ECF No. 19-1 at 7-8 (citing *In the Matter of Certain High-Performance Gravity-Fed Water Filters and Products Containing the Same*, Investigation No. 337-TA-1294; *Brita LP v. Zero Technologies LLC*, 1:21-cv-01801 (D. Del. Dec. 23, 2021)).)

Due to the pending ITC matter, a "mandatory"[2] statutory stay was put in place in the Delaware Action before the time had expired for ZeroWater to answer or otherwise respond to the complaint in that case.  (ECF No. 38 at 13, 89.)  As a procedural consequence of the stay, ZeroWater is unable file a motion to dismiss or an answer with a counterclaim in that matter.  (*Id.* at 75-76, 88.) ("[T]he case is stayed it's on ice, we don't have the ability to file anything . . .").  Since the ITC's jurisdiction is limited to alleged intellectual property violations, ZeroWater also cannot proceed with its antitrust claims in the ITC Action.  *See generally* 19 U.S.C. §1337.  (*See also* ECF No. 38 at 43.)  Nonetheless, Brita believes that ZeroWater filed its lawsuit here, and not in the District of Delaware "when it realized its defenses to [Defendants'] . . . patent infringement claim was imperiled."  (ECF No. 26 at 2.)  According to ZeroWater, Brita's true agenda for its Motion is not because the District of Delaware is "better suited" or must decide ZeroWater's claims, but rather "to delay[] this case indefinitely and prevent[] ZeroWater from enforcing antitrust laws" until Brita's "preferred ITC Action reaches a final judgment—potentially years from now."  (ECF No. 25 at 9.)

Presently before this Court is Defendants' Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer (ECF No. 19), which the Court heard oral arguments on September 28, 2023.  (ECF No. 28.)  Brita claims that ZeroWater's lawsuit belongs, not in this Court, but in the District of Delaware, either under the first-to-file doctrine or as a compulsory counterclaim to the Delaware Action.  Brita also argues that personal jurisdiction and venue in this Court are improper, and thus, this Court should dismiss the action under Federal Rule of Civil Procedure 12(b)(3) and

---

[2] In the instance when a civil action in a district court involves parties that are also parties to a pending ITC matter, at the request of the respondent in the ITC matter, "the district court *shall stay*, until the determination of the Commission becomes final, proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission." 28 U.S.C. § 1659(a) (emphasis added).

28 U.S.C. § 1406(a).  Brita asserts further that even if jurisdiction and venue are proper, in the alternative, this Court should transfer the case to the District of Delaware under 28 U.S.C. § 1404(a) "for the convenience of the parties and witnesses, and in the interests of justice."  (ECF No. 19-1 at 6-7.)  ZeroWater contends that Brita does not cite "a single case . . . where any court has ever taken a case and dumped it into a district where there's a stay" and so, "that is so tactical it cries out for denial."  (ECF No. 38 at 94.)

For the reasons that follow, the Court denies Defendants' Motion.  First, this Court finds that personal jurisdiction and venue are proper.  Second, ZeroWater's antitrust claim is not a compulsory counterclaim to the Delaware Action nor is there enough of an overlap between either action such that the first-to-file doctrine applies.  Further, even if there was a sufficient nexus between ZeroWater's antitrust claim and the Delaware Action, the equitable exceptions to the first-to-file doctrine counsel against a transfer in this case.  Federal Rule of Civil Procedure 13(a) does not nullify those exceptions which are rooted in fairness.  The Court also declines to exercise its discretion to transfer the case under 28 U.S.C. § 1404(a).  Use of procedural rules to subject a claim to an indefinite stay in placeholder litigation without having to prove that the stay is warranted is a form of procedural gamesmanship designed to thwart the application of the law. This form of procedural gamesmanship is neither in the interest of justice nor furthers judicial economy as contemplated by the first-to-file doctrine, Rule 13(a), and 28 U.S.C. § 1404(a).

## I.   BACKGROUND

In its Complaint, ZeroWater casts Brita's conduct of waiting for a technology to be embedded and so entrenched in an industry before filing a patent infringement litigation as

amounting to what some refer to as a "patent ambush"[3]—coined for corporate actions, which exploit intellectual property rights and industry "standards-setting organizations" to take out competitors, and thus, can ultimately be a violation of antitrust law.  *See, e.g.*, *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007) (referring to the defendant's alleged anticompetitive conduct as "patent ambush"); William J. Baer & David A. Balto, *Antitrust Enforcement and High-Technology Markets*, 5 Mich. Telecomm. & Tech. L. Rev. 73, 82 (1998) (referring to "patent ambush" as anticompetitive); Brian Dean Abramson, *The Patent Ambush: Misuse or Caveat Emptor?*, 51 IDEA 71, 94 (2011) (noting that "FTC officials coined the term patent ambush. . .").  Brita paints a different picture, arguing that it simply seeks to enforce its patent.  (ECF No. 19-1 at 7.)  Brita believes ZeroWater is improperly collaterally attacking its intellectual property rights in this Court, rather than in the District of Delaware where Brita first filed a patent infringement action against ZeroWater.  Therefore, in order to understand either party's arguments, it is necessary for this Court to briefly discuss what a "patent ambush" is, and the relevant legal and "standards-setting" landscape as it relates to ZeroWater's allegations.

Standards-setting organizations ("SSOs") are groups that meet to adopt uniform standards for a certain subset of goods or services, often comprised of competitors in the industry.  *See* Theresa R. Stadheim, *Rambus, N-Data, and the FTC: Creating Efficient Incentives in Patent Holders and Optimizing Consumer Welfare in Standards-Setting Organizations*, 19 Alb. L. Jo. Sci. & Tech. 483, 487 (2009); Mark A. Lemley, *Intellectual Property Rights and Standard-Setting*

---

[3] Sometimes a patent ambush is also referred to as a form of a "patent hold-up."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F. 3d 297, 310 (3d Cir. 2007) ("[P]atent hold-up" can occur when "[i]ndustry participants who have invested significant resources developing products and technologies that conform to the [standard-setting organization's] standard will find it prohibitively expensive to abandon their investment and switch to another standard).  *See also Microsoft Corp. v. Motorola, Inc.*, 696 F. 3d 872, 876 (9th Cir. 2012) (describing patent hold-up situations as when widespread standard compliance allows standard-essential patent holders to demand excessive royalties).

*Organizations*, 90 Cal. L. Rev. 1889, 1892 (2002).  Adopting uniform technical standards for a particular product typically benefits consumers.[4]  *See Apple, Inc. v. Motorola Mobility, In*c., No. 11-cv-178, 2011 U.S. Dist. LEXIS 72745, at *1 (W.D. Wis. June 7, 2011).  When a company engages in a "patent ambush," consumers can be harmed by the adoption of standards intended to benefit them.  A "patent ambush" is said to occur when a patent owner participates in the decision of an SSO to adopt a particular technology or technical standards for a particular industry, while failing to disclose its ownership of patents incorporating that standard, sometimes referred to as a "standard essential patent."[5]  *Broadcom Corp. v. Qualcomm Inc.*, 501 F. 3d 297, 310 (3d Cir. 2007).  The patent owner then waits for the standard to become entrenched—after consumers become comfortable with it and competitors expend significant money, resources, and time adjusting their production to conform to the standard—before asserting their patent rights.  The patent owner's ability to deny access to the technology itself grants the patent owner control over standard compliance; thus, the patent owner can then monopolize the market by forcing out competitors or demanding higher licensing fees from competitors, who now have no choice but to pay in order to comply with the standard.  *See Broadcom Corp.*, 501 F. 3d at 314.  Such conduct can harm consumers in the form of higher prices, reduced innovation, and more limited choices for standard-compliant products.  *See id.*  And it can also violate Section 2 of the Sherman Act, which imposes liability on "'every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States.'"  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d

---

[4] For instance, consumers benefit when standards are set for telephones ensuring interoperability, compatibility, and seamless communication between different devices and telephone networks because otherwise consumers might not be able to call each other.  *See Stadheim*, 19 Alb. L. Jo. Sci. & Tech. at 487.

[5] A patent that protects a technology that is necessary, namely "essential" to a standard, is termed a "standard essential patent."

85, 99 (3d Cir. 2010) (alteration accepted) (quoting 15 U.S.C. § 2).  *See also Broadcom Corp.*, 501

F. 3d at 314 (holding that in a "a patent holder's intentionally false promise to license essential

proprietary technology on FRAND terms . . . coupled with an . . . [SSO's] reliance on that promise

when including the technology in a standard" may be actionable anticompetitive conduct.")[6];

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007) (finding

anticompetitive conduct was alleged where "Rambus participated in a standards-setting

organization, understood [the] intellectual property disclosure policy, withheld information about

its patent applications, waited until the industry was irreversibly 'locked in' to the standard, and

then began a litigation campaign to extract royalties").  To address these concerns, SSOs often

have policies requiring their members to disclose their patent rights, pending patent applications,

or intentions to seek a patent that incorporates a standard that the SSO might adopt.  (ECF No. 1

at 4.)

In this case, ZeroWater alleges that Brita purposefully failed to disclose its intellectual

property rights as required and intended to hold a patent essential to the standard set by NSF

National, an SSO that sets technical standards for water filtration products, and its accreditation

body, the American National Standards Institute ("ANSI"), in order to monopolize the market.

(*Id.*)  ZeroWater and Brita both supply and develop consumer "high-performance gravity-fed water

filter products" that are certified by NSF under what is known as the "Health Effects" or

NSF/ANSI 53 standard.   (*Id.*)   This standard was adopted in February of 2007, after NSF

established task forces in 2004, which Brita representatives participated in, throughout the time-

period when those task groups considered and finalized the NSF/ANSI 53 standard.  (*Id.* at 14.)

---

[6] When a patent is essential to a technical standard, the patent owner and competitors can also agree to license the technology on "fair, reasonable, and non-discriminatory" terms, known by the acronym "FRAND" or "RAND," to safeguard against antitrust concerns.  *See Broadcom Corp.*, 501 F. 3d at 314.

The NSF/ANSI 53 standard sets minimum requirements for the materials, design, construction, and performance of drinking water treatment systems that are designed to reduce specific health-related contaminants, such as lead, Cryptosporidium, VOCs, and chromium, in water supplies. (ECF No. 1 at 9; ECF No. 25 at 13.)  To receive an NSF/ANSI 53 certification, a manufacturer must submit a product for third-party testing.  (ECF No. 1 at 9.)  Once a product meets the standard, the product is posted on NSF's website, and the manufacturer may use certain logos indicating certification and make certain health-related claims.  (*Id.* at 9, 23.)  NSF/ANSI 53 certification by NSF may indicate to the consumer that the product can remove contaminants as marketed, and in certain states, such as Iowa and California, such certification is required to sell the parties' products.  (*Id.* at 23.)

While ZeroWater alleges it was the first to bring an NSF-certified filter to market in 2007, Brita claims that it was the first to develop "high-performance gravity-fed water filter products that both remove contaminants and achieve fast flow rates."  (ECF No. 25 at 13; ECF No. 7.)  Brita filed a patent—known as '141 Patent and entitled "Gravity Flow Filter"—for this technology on September 9, 2008.  (ECF No. 1 at 18.)  The United States Patent and Trademark Office issued the '141 Patent (U.S. Patent No. 8,167,141) on May 1, 2012, which Brita "is the owner [of] by assignment."  (*Id.* at 19.)  ZeroWater claims that "the '141 Patent *expressly incorporates* the NSF/ANSI 53 Standard" and thus, is a standard essential patent.  (*Id.* at 20.)  Pursuant to ANSI's Patent Policy "expressly adopt[ed]" by NSF, Brita was required to provide assurances to the NSF that it "does not hold and does not currently intend [to] hold[] any essential patent claim(s)' or that it will license those rights at no cost or FRAND terms and rates in the event the standard is enacted notwithstanding the existence of a standard essential patent."  (*Id.* at 13.)  These requirements apply "with equal force to situations involving (1) the discovery of essential patent claims that may

8

be required for use of a standard subsequent to its adoption and (2) the initial issuance of a patent

after adoption." (*Id.*)  NSF's Antitrust Guide also states that "[s]tandards programs must not be

used as devices to . . . lessen competition." (*Id.* at 11.)  ZeroWater alleges that Brita did not make

the required disclosures or comply with these policies.  Instead, according to ZeroWater, Brita

concealed its "standard-essential patents and/or patent intentions while guiding the standard setting

process as a member of the NSF committee, in violation of NSF and ANSI Rules and the antitrust

laws." (ECF No. 43 at 5.)

Brita states that when it discovered that ZeroWater was selling similar gravity-fed water

filters in 2021, it brought suit on December 23, 2021 against ZeroWater in the District of Delaware

alleging infringement of the '141 Patent.  *Brita LP v. Zero Technologies LLC*, 1:21-cv-01801 (D.

Del. Dec. 23, 2021).[7]  Brita also filed a complaint, alleging violations of Section 337 of the Tariff

Act of 1930, 19 U.S.C. § 1337, before the United States International Trade Commission ("ITC"),[8]

seeking to prohibit ZeroWater and several other competitors from importing for sale its products

---

[7] ZeroWater is a Delaware limited liability company with its principal place of business in this District, in Trevose, Pennsylvania. (ECF No. 1 at 7.)  The Clorox Company, the "ultimate parent company" of Brita LP, is a Delaware corporation with its principal place of business in Oakland, California, while Brita LP is an Ontario limited partnership organized under the laws of Canada and headquartered in Neuchatel, Switzerland.  (ECF No. 19-2 at 1-2.)  Brita choose to file its patent infringement action in the District Court of Delaware, where ZeroWater is incorporated, pursuant to the specific patent venue statute, 28 U.S.C. § 1400(b).  *See also TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017) (patent venue is limited to the defendant's state of incorporation or where the defendant has committed acts of infringement and has a "regular and established place of business").

[8] The ITC is an independent federal agency created by Congress with broad investigative responsibilities in matters of international trade.  *See* Revenue Act, 39 Stat. 795; 19 U.S.C. § 2231.  It is comprised of both the Commission itself, which normally has six members appointed by the President and confirmed by the Senate, and administrative law judges ("ALJs").  *See* 19 U.S.C. § 1330; *see also* U.S. International Trade Commission, Publication No. 4105, *Section 337 Investigations: Answer to Frequently Asked Questions*, at 1-3 (2009).  When an investigation is instituted, an ALJ is assigned to preside over the proceedings and to render an initial decision (referred to as an "Initial Determination") as to whether Section 337 has been violated.  *Id.*  Following a hearing on the merits of the case, the presiding ALJ issues an Initial Determination ("ID") that is certified to the Commission along with the evidentiary record.  *Id.*  The Commission may review and adopt, modify, or reverse the ID; or it may decide not to review the ID.  If the full Commission affirms the ALJ and issues an exclusion order, that order is subject to review by the President of the United States, who can nullify the order within sixty days.  19 U.S.C. § 1337(j)(2).  If the Commission declines to review an ID, the ID becomes the final determination of the Commission. *Section 337 Investigations*, at 3 (2009).  Appeals of Commission orders entered in Section 337 investigations are heard by the U.S. Court of Appeals for the Federal Circuit.  19 U.S.C. § 1337(c).

that allegedly infringe upon Brita's same patent. (ECF No. 19-1 at 7.); *In the Matter of Certain High-Performance Gravity-Fed Water Filters and Products Containing the Same*, Investigation No. 337-TA-1294.[9]  On January 31, 2022, the ITC instituted an investigation based on Brita's complaint, which named nine respondents, including ZeroWater. (ECF No. 29 at 4.)  These actions were instituted more than nine years after Brita obtained its patent and fourteen years after ZeroWater obtained publicly available NSF certification and began selling its product. (ECF No. 25 at 13.)

According to ZeroWater, Brita waited nearly a decade to assert its patent rights, not to legitimately protect its intellectual property, but rather as a part of a concerted effort to block competitors, such as ZeroWater, from the market.  ZeroWater had "invested valuable time, resources, and money to develop . . . compliant filters, obtain and maintain NSF certification, and manufacture, market, and sell those products nationwide, all the while ***not*** pursuing potential alternatives" in reliance "on the impression (which Defendants deliberately created through their non-disclosure) that there were no intellectual property rights encumbering the Health Effects Standard." (ECF No. 25 at 13.)  By that time, not only was the technology Brita claims ZeroWater and other competitors were infringing essential to receive NSF certification (a critical designation in the water filtration sales market), but competitors in the industry were also "locked in" due to Brita's "scheme." (ECF No. 1 at 35.)  ZeroWater claims that the patent gives Brita the power "to block any gravity-fed water filter that complies with the applicable NSF standard from the U.S.

---

[9] ITC actions provide an alternative venue to the federal courts for complainants to seek redress for patent infringement.  However, it is not uncommon for an alleged patent holder to simultaneously file parallel matters in both the ITC and district court because of the differences between ITC and standard district court litigation.  For instance, while an ITC action offers a powerful weapon to combat infringement by blocking the importation of infringing products at U.S. ports of entry, the remedies available to the ITC are injunctive in nature and thus, monetary damages may only be sought in district court.  *See* 19 U.S.C. § 1337 (d)-(i).

market," even though NSF certification is required to sell water filters in some states, like Iowa and California, and provides the authority needed to ensure advertising compliance with the Federal Trade Commission Act, 15 U.S.C. § 41.  (*Id.* at 23-24.)  Further, since "ZeroWater's product is currently the *only* high-performance gravity-fed water filter that has been certified under the NSF/ANSI 53 Standard's PFOA/PFOS, lead, and chromium reduction claims," ZeroWater argues that Brita's anticompetitive conduct prevents consumers from accessing the only product that effectively eliminates these dangerous contaminants.  (*Id.* at 7.)  ZeroWater alleges that Brita's intention "is to preclude its competitors from meeting the standard and obtaining the certification required for marketability of high-performance gravity-fed water filter products, which is, in effect, to preclude its competitors from offering products that make water safe to drink."  (*Id.* at 22.)

On January 1, 2022, the parties stipulated to stay the Delaware Action pending final resolution of the ITC Action including any appeals they could take.  *See* Stipulation & Order Granting Stipulation, *Brita LP v. Zero Technologies LLC*, 1:21-cv-01801 (D. Del. Jan. 13, 2022), ECF Nos. 8-9.  Meanwhile, on February 28, 2023, the Administrative Law Judge ("ALJ") in the ITC Action made a final Initial Determination ruling against ZeroWater.[10]  (ECF No 29 at 5.)  ZeroWater appealed to the Commission, which made a Final Determination on September 19, 2023—as confirmed in its September 22, 2023 public Commission Opinion—that it did not adopt the ALJ's recommendation and instead ruled in ZeroWater's favor.[11]  (ECF No. 33-1 at 59-60;

---

[10] Specifically, the ALJ found that ZeroWater violated Section 337, and that they also failed to show by clear and convincing evidence that Brita's '141 Patent was invalid.  (ECF No 29 at 5.)  The ALJ recommended a limited exclusion order, and a bond which ZeroWater characterizes as "remedial orders that . . . would have shut down their business."  (ECF No. 38 at 51.)

[11] In particular, the Commission found that Brita's patent was invalid based on three of the nine grounds ZeroWater had asserted for patent invalidity.  (ECF No. 33-1 at 59-60; ECF No. 38 at 53.)  The Commission, however, did not take a position on the remaining six arguments ZeroWater had put forth.  (*Id.*)

ECF No. 38 at 53.)  Brita filed an appeal of the ITC decision before the United States Court of Appeals for the Federal Circuit.  (ECF No. 43 at 5.)  ZeroWater states that "final resolution of the Federal Circuit appeal from the ITC proceeding, during which the Delaware district court case will not proceed, could be years away."  (ECF No. 47 at 2.)  Based on the Commission's opinion, which did not rule on all the issues before it, if the Federal Circuit reverses its decision, the court could remand the matter to the ITC for further determination, which could again be subject to another appeal.  (ECF No. 47 at 2.)  In sum, "there is not a quick resolution in sight to this ITC investigation."  (ECF No. 38 at 53.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) motion to dismiss for lack of personal jurisdiction challenges the ability of the court to assert judicial power over the defendant.  Fed. R. Civ. P. 12(b)(2).  In reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  *Pinker v. Roche Holdings Ltd*., 292 F.3d 361, 368 (3d Cir. 2002).  The plaintiff has the burden of establishing "with reasonable particularity sufficient contacts between the defendant and the forum state."  *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *see also Action Mfg. Co. v. Simon Wrecking Co.,* 375 F. Supp. 2d 411, 418 (E.D. Pa. 2005) (A plaintiff satisfies this prima facie standard by presenting facts that, if true, would permit the court to exercise personal jurisdiction over the defendant.).  However, when a defendant challenges a court's personal jurisdiction, the plaintiff must then establish its existence.  *See O'Connor v. Sandy Lane Hotel Co*., 496 F.3d 312, 316 (3d Cir. 2007).  The plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts

between the defendant and the forum state to support jurisdiction." *Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987).

Federal Rule of Civil Procedure 12(b)(3) provides that a motion to dismiss may be made on the basis of improper venue. Fed. R. Civ. P. 12(b)(3). The purpose of venue, in most instances, "is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Cottman Transmissions Systems, Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). "Because improper venue is an affirmative defense, the burden of proving lack of proper venue remains—at all times—with the defendant." *Great Western Min. & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011). "When considering a motion to dismiss for improper venue, the court must generally accept as true the allegations in the pleadings and must view the facts in the light most favorable to the nonmoving party." *Sinclair Cattle Co., Inc. v. Ward*, 80 F. Supp. 3d 553, 557-58 (M.D. Pa. 2015). When venue is defective, 28 U.S.C. § 1406(a) authorizes the court to either "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

## III. DISCUSSION

At the core of this matter is the foreseeable consequence of Brita's Motion—if this Court transfers this case as a compulsory counterclaim or under the first-to-file doctrine to the Delaware Action, the case would remain at a standstill potentially for many years, awaiting the exhaustion of the ITC Action and appeals; an inevitable result that Brita does not dispute. Brita's position is that the indefinite stay of the Delaware Action was of "ZeroWater's own making" since ZeroWater, not Brita, "requested a stay of the Delaware Action." (ECF No. 26 at 2.) That, however, is not an entirely accurate representation of the statutory framework. The statute the parties' stipulation was made pursuant to, 28 U.S.C. § 1659(a), has been referred to as requiring a

"mandatory stay" of a district court proceeding when parallel claims involving the same issues about the same patent are brought before the ITC.  *Wiretgen Am., Inc. v. Caterpillar Inc.*, No. 17-770-RGA, 2021 U.S. Dist. LEXIS 256212, at *2-3 (D. Del. May 27, 2021).[12]  The ITC proceedings are "final" as they relate to 28 U.S.C. § 1659(a) when they are "no longer subject to judicial review," including any remand proceedings.  *In re Princo Corp.*, 478 F.3d 1345, 1355 (Fed. Cir. 2007).  Though this statutorily mandated stay is not triggered until requested by the alleged infringer, the stay would have never been in place had Brita not brought the ITC action and, therefore, stipulated to it.  Thus, the indefinite stay is not of ZeroWater's "own making" in isolation but also a product of Brita's litigation choices.

Regardless of whether ZeroWater or Brita are to blame for the stay, the fact remains that if this Court transfers this matter to the District of Delaware it will be mired in a standstill, potentially for years.  The Court does not find that the compulsory counterclaim rule or the first-to-file doctrine requires that a case that could be actively litigated in this Court should be forced into a potentially indefinite stay nor do they require that the Court allow itself to be used as a tool in an alleged anticompetitive scheme by subjecting ZeroWater's antitrust case to an indefinite stay, while Brita is allowed to proceed with its claims in the ITC action.  Brita does not cite any authority for this proposition, nor is this Court aware of any.  In deciding this matter, the Court makes the following determinations: (1) personal jurisdiction and venue are proper; (2) ZeroWater's antitrust claim is not a compulsory counterclaim to the Delaware Action nor is there enough of an overlap between either action such that the first-to-file doctrine applies; (3) alternatively, even if the first-to-file doctrine applied, departure from the doctrine is warranted; and (4) Brita has failed to sustain

---

[12] The purpose of the statute is to avoid duplicative proceedings.  *Wiretgen Am., Inc.*, 2021 U.S. Dist. LEXIS 256212, at *2-3; H.R. REP. NO. 103-826(I), at 140 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 3912-3913.

its burden to show that a transfer is warranted in the "interest of justice" under 28 U.S.C. §1404(a). The Court addresses each point in turn.

### A.      Venue under 28 U.S.C. § 1391 and the Clayton Act

In its Motion, Brita initially contended that venue in this Court was improper based on the venue provisions as set forth in 28 U.S.C. § 1391.  (ECF No. 19-1 at 10-13.)  Brita moved to dismiss this action under Rule 12(b)(3) and 28 U.S.C. § 1406(a) for improper venue, and not pursuant to Rule 12(b)(2) for lack of personal jurisdiction, with the basis for its argument being that it is not a "resident of Pennsylvania" nor "subject to general or specific jurisdiction here" as required by 28 U.S.C. § 1391.  (*Id.* at 10.)  Under the general venue provision, 28 U.S.C. § 1391, venue may be established if personal jurisdiction is also proper based on a defendant's contacts with this District.  ZeroWater correctly noted, however, Section 12 of the Clayton Act governs this antitrust action and provides for more expansive venue than under 28 U.S.C. § 1391.  *See* 15 U.S.C. § 22.   During oral arguments, Brita clarified that it does not dispute that "the Clayton Act supplements . . . 28 U.S.C. Section 1391 in terms of venue for anti-trust claims. . . [a]nd that . . . there is a separate analysis under the Clayton Act."  (ECF No. 38 at 73.)  Brita further stated that if ZeroWater's antitrust claims "had nothing to do with the ongoing patents litigation we might not have made this argument" but since "[t]hey are intertwined with the ongoing patent claims . . . that is really why these claims both belong in Delaware."  (*Id.*)   Brita has now focused its position on venue being improper due to the compulsory counterclaim and first-to-file doctrine.  Nonetheless, since Brita continued to argue for dismissal in oral arguments "under 28 U.S.C. Section 1406(a), when a defendant raises a jurisdictional defense," this Court will address both venue and personal jurisdiction as it relates to the present action.  (*Id.* at 16.)

This Court has personal jurisdiction over a defendant where the exercise of jurisdiction comports with due process and jurisdiction is authorized by statute. *See* Fed. R. Civ. P. 4(k)(1)(a); *O'Connor*, 496 F.3d at 316; *Kraus v. Alcatel-Lucent,* 441 F. Supp. 3d 68, 72 (E.D. Pa. 2020). Pursuant to 28 U.S.C. § 1406(a), if a district court finds venue to be improper, the court should dismiss the case or, if justice requires, transfer the case to a district where venue is proper. *See Goldlawr, Inc. v Heiman*, 369 U.S. 463, 466 (1962). In general, it is preferable to transfer a case to an appropriate federal forum rather than dismiss it. *See Salovaara v. Jackson Nat'l Life Ins. Co*., 246 F.3d 289, 299 (3d Cir. 2001). Though 28 U.S.C. § 1391(b)(1)-(3) sets forth the rules that govern venue generally in civil actions, Federal Rule of Civil Procedure 4(k)(1)(C) recognizes, in some instances, that Congress has provided special federal rules for establishing personal jurisdiction, venue, or both; the Clayton Act is one such statute.

In particular, a federal antitrust plaintiff may properly establish personal jurisdiction and venue against an out-of-state, corporate defendant in one of two ways. In one instance, an antitrust plaintiff may rely on traditional principles of personal jurisdiction and venue, demonstrating that the forum state's long-arm statute provides for personal jurisdiction and that venue is proper under the general federal venue statute, 28 U.S.C. § 1391. Section 1391 provides that a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.[13]

---

[13] In a single district state, corporate defendants are "deemed to reside," in any judicial district in which "it is subject to personal jurisdiction." 28 U.S.C. § 1391(c)(2). In a multi-district state like Pennsylvania, "reside" is defined to include "any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if

In another instance, an antitrust plaintiff may invoke Section 12 of the Clayton Act, which provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. Section 22 has two distinct clauses, the first addressing venue and the second addressing service of process and personal jurisdiction. The first clause sets venue anywhere the corporation is an "inhabitant," is "found," or "transacts business." *Id.* The second clause— permitting service where the corporation is an "inhabitant" or is "found"—deals with personal jurisdiction since under Federal Rules of Civil Procedure 4(k)(1) "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." *Id.*; Fed. R. Civ. P. 4(k)(1). The Third Circuit has interpreted this clause to permit personal jurisdiction in any forum state, based on a defendant's contacts with the United States as a whole because the Clayton Act provides for nationwide (and indeed worldwide) service of process by specifying "in such cases . . . wherever it may be found." *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 294-97 (3d Cir. 2004); *see also Access Telecomm., Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 718 (5th Cir. 1999)*, cert. denied,* 531 U.S. 917 (2000) ("When jurisdiction is invoked under the Clayton Act, the court examines the defendant's contacts with the United States as a whole to determine whether the requirements of due process have been met."); *Go-Video, Inc. v.*

---

that district were a separate State." *See* 28 U.S.C. § 1391(b)-(d). Pennsylvania's long-arm statute provides for personal jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States.". 42 Pa. C.S. § 5322(b); 28 U.S.C. § 1391(b)-(d); *see also Mellon Bank (East) PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992) ("[T]he court may go forward if it is satisfied that the relationship among the defendant, the cause of action, and the forum falls within the 'minimum contacts' framework.").

*Akai Electric Company*, Ltd., 885 F.2d 1406, 1415 (9th Cir. 1989) (affirming the District Court's holding that "worldwide service provision of § 12 justifies its conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts").  Thus, "personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole" and is not limited to the defendant's contacts with the forum, as it would be when proceeding under Section 1391 and Pennsylvania's long-arm statute.  *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 298.[14]

In this case, therefore, personal jurisdiction and venue may be established if: (1) pursuant to Section 1391 and Pennsylvania's long-arm statute, Brita's contacts with Pennsylvania and this District comport with federal due process; or (2) under the Clayton Act, Brita "transacts business" in this District and defendant's aggregate contacts with the United States would make it amenable to personal jurisdiction.  *See In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 299; *Go-Video*, 885 F.2d at 1415.

To satisfy federal due process guarantees, a federal court entertaining a suit must possess one of three forms of personal jurisdiction over the defendant: specific jurisdiction, general

---

[14] There is a circuit split on the interaction between these two clauses.  One view understands the two clauses of Section 12 to exist independent of one another, meaning that they do not have to be utilized in conjunction, but instead may be "mixed-and-matched" with other statutory provisions.  *Go-Video, Inc. v. Akai Electric Company*, Ltd., 885 F.2d 1406, 1413 (9th Cir. 1989) ("[W]e conclude that process may be served on an antitrust defendant pursuant to 15 U.S.C. § 22 in cases where venue is not established under that section but lies properly under 28 U.S.C. § 1391(d).").  In the context of personal jurisdiction and venue, this interpretation allows plaintiffs to pair Section 12's nationwide service of process clause with the general federal venue statute, 28 U.S.C. § 1391 which essentially produces proper venue anywhere in the nation, as a plaintiff can use Section 12's nationwide service of process clause to establish personal jurisdiction in any judicial district and then use Section 1391 to establish proper venue based upon personal jurisdiction.  *Go-Video*, 885 F.2d at 1415.  Regardless of approach, however, the courts seemingly agree with the notion that Section 12 grants nationwide personal jurisdiction in antitrust cases involving corporate defendants.  *Compare KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013) ("Section 12 provides for both personal jurisdiction and venue in the case of a corporate defendant. . . [T]he second clause provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal jurisdiction."), *with Go-Video, Inc.*, 885 F.2d at 1415 ("[W]e believe that the district judge clearly correct in his view and that the worldwide service provision of § 12 justifies its conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts.").

jurisdiction, or consent to jurisdiction.  *See Mallory v. Norfolk Southern Ry.*, 143 S. Ct. 2028, 2039 (2023).  Specific jurisdiction exists "when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum."  *Mellon Bank (East) PSFS*, 960 F.2d at 1221 (internal citation omitted); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984).  Courts apply a three-part inquiry to determine whether specific jurisdiction exists: (1) "the defendant must have 'purposefully directed its activities' at the forum;" (2) "the litigation must 'arise out of or relate to' at least one of those activities;" and (3) the exercise of jurisdiction must "otherwise comport[] with 'fair play and substantial justice.'"  *O'Connor*, 496 F.3d at 317 (internal citations omitted).  General jurisdiction allows a court to exercise jurisdiction over the defendant unrelated to the plaintiff's cause of action but requires that the defendant's contacts be "so 'continuous and systematic' as to render them essentially at home in" this state.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Nadzam v. Broan-NuTone, LLC*, No. 20-6088-KSM, 2020 WL 7640929, at *2 (E.D. Pa. Dec. 23, 2020).  As clarified recently by the Supreme Court in *Mallory v. Norfolk Southern Ry.*, an additional avenue exists where a defendant has consented to suit, which can occur by a defendant registering to do business in that state.  143 S. Ct. at 2039.

In this case, the Court concludes that personal jurisdiction and venue are proper whether analyzed more broadly under Section 12 of the Clayton Act or by assessing Brita's contacts with Pennsylvania pursuant to the long-arm statute and Section 1391.  While Brita claims there "is no factual connection to this venue, other than ZeroWater is headquartered here," it does not dispute that they are selling their products in this District.  (ECF No. 38 at 48, 74; ECF No. 25-3 at 1-2.)  Therefore, there is no question in this case that Brita satisfies the first clause of Section 12 of the Clayton Act for purposes of venue by "transact[ing] business" here.  *See* 15 U.S.C. § 22.  Brita

also does not argue that it lacks sufficient nationwide contacts to comport with federal due process guarantees.  ZeroWater has pled that Brita seeks to monopolize the market for NSF/ANSI 53 certified gravity-fed water filters, engages in this unlawful conduct within the United States, and sells its products here, which, accepting all of the plaintiff's allegations as true and construing disputed facts in favor of the plaintiff on this Motion, collectively establishes specific jurisdiction under the Clayton Act.  (ECF No. 1 at 8-12, 23, 25-27; ECF No. 19-5.).  *See also, e.g.*, *In re Capacitors Antitrust Litig.*, No. 14-cv-3264, 2015 WL 3638551, at \*2 (N.D. Cal. June 11, 2015) (holding that defendants had sufficient contacts with United States because they sought to fix prices in United States market and shipped products there); *In re Aluminum Warehousing Antitrust Litig.*, No. 14-cv-3116, 2015 WL 6472656, at \*12 (S.D.N.Y. Oct. 23, 2015).

The Court also finds that Brita's contacts with this District subject it to specific jurisdiction, if not also consent jurisdiction, such that this action is properly here under Section 1391 and Pennsylvania's long-arm statute.  ZeroWater is a Delaware limited liability company with its principal place in this District, in Trevose, Pennsylvania.  ZeroWater chose this forum because the "harm is suffered here, that's why we brought the case here."  (ECF No. 38 at 74.)  That harm includes having to "completely change the way we make this product, sell the product," "losing . . . tremendous amounts of business" and "an existential threat to shut down their business in the U.S.," which "was felt particularly by a lot of employees right up the road."  (*Id.* at 54.)  ZeroWater states in its Complaint that it "has also suffered loss of profits, loss of customers and potential customers, and loss of goodwill and product image as a result of Brita's conduct alleged herein"

and seeks injunctive relief for Brita's "ongoing deception."[15]   (ECF No. 41 at 12-13; ECF No. 1 at 5, 18, 29-30, 33, 39.)  The damages were felt in Pennsylvania, and while "some of the conduct actually took place in Pennsylvania" as well as in Michigan and California, according to ZeroWater, "nothing has occurred in Delaware."  (ECF No. 38 at 43; ECF No. 19-4 (inventor declaration stating "[t]he conception and reduction of the '141 Patent occurred in the State of California" with the patent application filed in Virginia); ECF No. 19-5 (declaration stating that Brita participated via conference call from California in NSF task force that led to the adoption of the NSF/ANSI 53 standard).)  During oral arguments, ZeroWater indicated that the parties sell their products in many of the same retailers, including in Pennsylvania, and those "retailers were calling us up saying, we're being told that you're not going to be able to supply us products." (ECF No. 38 at 64.)  Those calls were made to Trevose, Pennsylvania where ZeroWater is headquartered "saying we got this letter" which was "sent pretty much wholesale to all of our material retail customers" and asking "for comment on how are you going to be able to supply us product and questions like that."  (Id. at 77.)  According to ZeroWater, it is "still getting calls from customers saying in six months am I going to be able to sell your product or not, and huh, we're not sure that's good enough."  (Id. at 66.)

Brita asks this Court not to consider the "purported harms" that ZeroWater alleged occurred here in Pennsylvania during oral arguments since, according to Brita, they are found "nowhere . . . in ZeroWater's Complaint, briefing, or supporting declarations."  (ECF No. 41 at 12.)  Regardless, while Brita states "Defendants have not issued any press release regarding the ITC's Initial

---

[15] Brita believes these allegations to be too "conclusory."  (ECF No. 41 at 12-13; ECF No. 1 at 5, 18, 29-30, 33, 39.)  The federal notice-pleading standards, when considering the standard on Brita's motion for improper venue, do not require ZeroWater to plead its alleged ongoing losses at a granular level at this time.  See Fed. R. Civ. P. 8(a); Sinclair Cattle Co., Inc. v. Ward, 80 F. Supp. 3d 553, 557-58 (M.D. Pa. 2015).

Determination," it acknowledges it "sent written communications to a limited number of their own retailer customers following the ITC's decision; those communications did not direct those customers not to purchase ZeroWater water filter products." (*Id.* at 14.)  Since Brita has admitted it sent written communications, and thus, there is no factual dispute as to that point, the Court will consider this for purposes of its Motion along with the ongoing harm and Brita's business activities within Pennsylvania as alleged in ZeroWater's Complaint.  These touchpoints with Pennsylvania establish that Brita has "purposefully directed" its alleged unlawful conduct here, which "arise out of or relate to" ZeroWater's claims, such that the exercise of specific jurisdiction comports with "fair play and substantial justice."  *O'Connor*, 496 F.3d at 317.  Brita also clarifies that "it sells water filter products to retailers in the Commonwealth through an affiliate entity, The Clorox Sales Company, which is registered with the Pennsylvania Secretary of State" thereby providing a potential alternative basis for consent jurisdiction.[16]  (*Id.* at 7.)  Given the totality of these contacts with Pennsylvania, as well as the United States as a whole, exercising jurisdiction over Brita does not offend traditional notions of fair play and substantial justice.  Thus, venue is proper in this District.

## B.  The First-to-File Doctrine and Compulsory Counterclaim Rule

At the center of the parties' venue dispute are two procedural rules—the first-to-file doctrine and the compulsory counterclaim rule—whose interaction when both are invoked has not yet been addressed with consistent clarity by the courts.  Specifically, which of these rules should a court apply when a defendant claims, as is the case here, that the plaintiff's action should, in fact,

---

[16] The Pennsylvania Supreme Court has not yet addressed how the consent jurisdiction analysis is impacted when an affiliate company is registered to do business in Pennsylvania.  The Court notes this as an additional potential basis for personal jurisdiction.

be a compulsory counterclaim to a pending action it filed first in another district court, or if both apply, what is the appropriate interplay between the two?  Adding to the uncertainty is a circuit split stemming from a Supreme Court decision, *Mercoid Corp. v. Mid-Continent Investment Co*, 320 U.S. 661 (1944), as to when an antitrust claim is a compulsory counterclaim to a patent infringement action: a determination that can impact where those claims can be brought and appealed to, along with potential res judicata implications.

After thoughtful and deliberate review of the factual circumstances presented in this case, the Court concludes that ZeroWater's case is properly before this Court.  ZeroWater's antitrust claims in the present case are not compulsory counterclaims to the Delaware Action nor "substantially similar" for purposes of the first-to-file doctrine.  But even if they were determined to be "substantially similar," the Court finds that departure from the first-to-file doctrine is warranted based on the judicially declared exceptions to that rule.  In making this determination, the Court finds that Federal Rule of Civil Procedure 13(a) does not support the conclusion that the compulsory counterclaim rule should be read as a venue provision that vitiates the judicially declared exceptions to the first-to-file doctrine; rather, the first-to-file doctrine and the compulsory counterclaim rule are complements to each other.

## 1.    Relationship Between the First-to-File Doctrine and Compulsory Counterclaim Rule

Before applying the compulsory counterclaim rule and first-to-file doctrine to the facts of this case, the Court finds it necessary to determine what the interplay between the rule and the doctrine is.  The compulsory counterclaim rule, as set forth in Federal Rule of Civil Procedure 13(a) provides:

> "A pleading must state as a [compulsory] counterclaim any claim that –
> at the time of its service – the pleader has against an opposing party if the claim:
> (A) arises out of the transaction or occurrence that is the subject matter of the

23

> opposing party's claim; and (B) does not require adding another party over whom
> the court cannot acquire jurisdiction."

This rule contains exceptions if "when the action was commenced, the claim was the subject of another pending action" or "the opposing party sued on its claim by attachment or other process that did not establish personal jurisdiction over the pleader on that claim, and the pleader does not assert any counterclaim under this rule."  Fed. R. Civ. P. 13(a)(2).  The rule is "designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters."  *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962) (per curiam).

Whether a counterclaim is compulsory under Rule 13(a) turns on whether it arises out of the "transaction or occurrence" that is the subject matter of the opposing party's claim, and this standard is met when there is a "logical relationship" between the counterclaim and the main claim. *Transamerica Occidental Life Ins. Co.  v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002).  A "logical relationship" exists where:

> "separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy require that the counterclaimant be permitted to maintain his cause of action."

*Great Lakes Rubber Corp. v. Herbert Cooper Co*., 286 F.2d 631, 634 (3d Cir. 1961).  The Third Circuit has also noted that there is a close connection between Rule 13(a) and res judicata principles.  *See Transamerica*, 292 F.3d at 391 ("[C]ompulsory counterclaim inquiry [under Fed. R. Civ. P. 13(a)] . . . requires essentially the same comparison between claims as the res judicata analysis."); *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 121 (3d Cir. 2014).  In sum, although the logical relationship test does not require an absolute duplication of factual backgrounds, the

essential facts of the claims must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.

Under the first-to-file doctrine, when two substantially similar lawsuits are filed in different courts with concurrent jurisdiction, there is a presumption that the court where the matter was filed first should hear both lawsuits except in special circumstances.  *See Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929-30 (3d Cir. 1941); *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988) *aff'd*, 493 U.S. 182 (1990).  Though the doctrine is "not cabined to proceedings involving identical parties and identical issues" there must be "substantial similarity" between the two actions.  *Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 457 (E.D. Pa. 2013).  The first-to file doctrine is not absolute, and includes the following recognized exceptions: (1) rare or extraordinary circumstances; (2) inequitable conduct; (3) bad faith; (4) forum shopping; (5) where the later-filed action has developed further than the first-filed action; and (6) when the first filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum.  *See Univ. of Pennsylvania*, 850 F.2d at 976; *Owen v. Nestle Healthcare Nutrition, Inc.*, Civ. No. 22-2855, 2023 U.S. Dist. LEXIS 36638, at *3-4 (D.N.J Mar. 6, 2023).

Both the first-to-file doctrine and compulsory counterclaim rule utilize slightly different language when assessing whether two pending matters share enough in common that they should be brought in the same court: while the first-to-file doctrine requires application of the definition of "substantial similarity," the compulsory counterclaim rule requires the application of the "logical relationship" analysis.  Additionally, there are other critical differences between the rules. While both contain exceptions, the first-to-file doctrine has more extensive judicially declared exceptions than the statutory exceptions set forth in Rule 13(a).  *Compare* Fed. R. Civ. P. 13(a)(2) (providing for two exceptions), *with Univ. of Pennsylvania*, 850 F.2d at 976 (providing for six

exceptions).[17]  And though the first-to-file doctrine allows for a court to dismiss, stay, or transfer

an action, the compulsory counterclaim rule does not explicitly provide for a pre-judgment remedy

for violations of Rule 13(a).  *Compare Chavez v. Dole Food Co.,* 836 F.3d 205, 210 (3d Cir. 2016)

(reasoning that first-to-file doctrine empowers the district court to transfer, stay, or dismiss a

second-filed action), *with Publicis Communications v. True North Communications*, 132 F.3d 363,

365 (7th Cir. 1997) ("Despite the impression one might get from the name of the doctrine, no one

is 'compelled' to present a compulsory counterclaim.  Only a litigant that wants to avoid a later

defense of preclusion need do so.").[18]  Courts have consistently held that failure to plead a

compulsory counterclaim bars a later independent action on that claim, but have not been clear as

to its pre-judgment impact or what its interplay is with the first-to-file doctrine.  *See Baker v. Gold*

*Seal Liquors, Inc.,* 417 U.S. 467, 469 n.1 (1974); *M.R. v. Ridley Sch. Dist.,* 744 F.3d 112, 121 (3d

Cir. 2014).  Some courts have applied both rules concluding they are harmonious,[19] some apply

the compulsory counterclaim rule instead of the first-to-file doctrine,[20] and yet others decline to

---

[17] The first-to-file doctrine has been applied not just in the compulsory counterclaim context, but also where the same plaintiff brings two cases involving the same or similar parties in more than one court.  *See, e.g.*, *Servian v. Health Data Sciences Corp.*, Civ. No. 92-2693, 1992 U.S. Dist. LEXIS 10383, at *3 (E.D. Pa. 1992) ("The Third Circuit applies the 'first-filed' rule to determine whether a cause of action is required to be adjudicated as a compulsory counterclaim.").

[18] Indeed, the Advisory Committee's Notes of Rule 13(a) address only the post-judgement consequences, stating that "[i]f the action proceeds to judgment without the interposition of a counterclaim as required by [the rule], the counterclaim is barred."  Fed. R. Civ. P. 13(a), Advisory Committee's Note 7.  Courts have consistently held that failure to plead a compulsory counterclaim bars a later independent action on that claim, but have not been clear as to its pre-judgment impact or what its interplay is with the first-to-file doctrine.  *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1 (1974); *M.R. v. Ridley Sch. Dist.,* 744 F.3d 112, 121 (3d Cir. 2014).

[19] *See, e.g.*, *PPL Energy Servs. Holdings, Inc. v. Zoot Properties, LLC*, Civ. No. 05-661, 2006 WL 2524228, at *4-8 (E.D. Pa. August 30, 2006) (noting that the "first-filed rule and the compulsory counterclaim principles are not distinct, and the existence of a separate suit does not guarantee dismissal" to conclude that a transfer was inappropriate due to defendant's "creative" though blatant forum shopping); *Zelenkofske Axelrod Consulting, LLC v. Stevenson*, No. Civ.A.99-3508, 1999 U.S. Dist. LEXIS 12137, 1999 WL 592399, at *1 (E.D. Pa. Aug. 5, 1999) (whether claims are "logically related" for purposes of the compulsory counterclaim rule are assessed by looking at if they involve: (1) many of the same factual issues; (2) substantially similar legal issues; or (3) are "offshoots of the same basic controversy between the parties" ).

[20] *See, e.g.*, *Rohm & Haas Co. v. Brotech Corp.*, 770 F. Supp. 928, 935 (D. Del. 1991) (using the compulsory counterclaim rule to enjoin second-filed patent case, with no mention of the first-to-file doctrine).

apply the compulsory counterclaim rule pre-judgment when it would rid the first-to-file doctrine of its equitable exceptions.[21]

Brita asks this Court to embrace an interpretation of Rule 13(a) without an explicit statutory grant or case law that requires this rule to be interpreted pre-judgment. And, in doing so, to require a case transfer which would result in consolidation with another case that is subject to a mandatory and indefinite stay. Further, under Brita's interpretation of the compulsory counterclaim rule and first-to-file doctrine, Brita would be able to continue pursuing its patent claim before the ITC in its chosen forum. During that time, the potential harm is particularly acute because it would allow Brita to continue the very conduct ZeroWater alleges is unlawful and inflicting damages on them (and potentially consumers), evading judicial review for many years, while Brita never has to prove that a stay is warranted in this antitrust case. (ECF No. 38 at 60, 64-65 (noting the ongoing harm).) The Court, therefore, rejects Brita's position that there is now "no alleged harm" based on ZeroWater's continued ability to sell its products during the pendency of the appeal of the ITC Action. (ECF No. 41 at 6.)

The first-to-file doctrine and compulsory counterclaim rule were not designed to subvert resolution of a case on the merits. Nothing would run contrary to the judicial economy or efficiency concerns of the first-to-file doctrine and compulsory counterclaim rule more than to interpret the rules, as ZeroWater alleges, as a means to prevent or stall litigants from having their day in court while damages are ongoing. To interpret the rules in this manner, would sanction the

---

[21] *See, e.g.*, *NBC Studios, LLC v. Dish Network Corp.*, CV 12-04536, 2012 WL 12886834, at *3-4 (C.D. Cal. Nov. 8, 2012) (rejecting argument that Rule 13(a) requires dismissal because "it would eviscerate the Seventh Circuit's precedent on the first-to-file rule"); *United States ex rel. Brown Minneapolis Tank Company v. Kinley Construction Company*, 816 F. Supp. 2d 1139, 1172 (D.N.M. 2011) (stating Rule 13(a) is "not the vehicle" for dismissal or transfer); *Southmark Corp. v. PSI, Inc.*, 727 F. Supp. 1060 (S.D. Miss. 1989) (holding that the court need not consider whether the claims qualified as a compulsory counterclaim, because the defendant's race to the courthouse was a reason for departure from the first-to-file doctrine).

type of procedural gamesmanship and litigation tactics the judicially declared exceptions to the first-to-file doctrine were designed to guard against.  It also highlights the precise dangers of interpreting the compulsory counterclaim rule as overriding the judicially declared exceptions to the first-to-file doctrine.

Therefore, the Court declines to interpret the rules in such a manner here and concludes, consistent with other courts, that the first-to-file doctrine and compulsory counterclaim rule should be applied harmoniously; if the first-to-file doctrine warrants departure due to an exception, then the compulsory counterclaim rule will not override it.  *See, e.g.*, *Chavez*, 836 F.3d at 220 ("[A] district court should generally avoid terminating a claim under the first-filed rule that has not been, and may not be, heard by another court."); *PPL Energy Servs. Holdings, Inc. v. Zoot Properties, LLC*, Civ. No. 05-661, 2006 WL 2524228, at *4-8 (E.D. Pa. August 30, 2006) (citing *Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 350 (D.C. Cir. 2003)) ("However, the first-filed rule and the compulsory counterclaim principles are not distinct, and the existence of a separate suit does not guarantee dismissal.").

### 2.    Application of the First-to-File Doctrine and Compulsory Counterclaim Rule

The Court will now apply the doctrine and rule to this matter.  Brita agrees that the two tests—"logically related" and "substantially similar"—would prescribe the same result and thus, are "harmonious," but the parties disagree as to their application in this case.  (ECF No. 38 at 82.) Brita argues that ZeroWater's antitrust case either shares a "logical relationship" with the patent claim it brought or is "substantially similar" to the Delaware Action, and therefore, should be transferred to the District of Delaware under the compulsory counterclaim rule or the first-to-file doctrine.  Brita claims that under either of these rules, "ZeroWater's anti-trust and contract claims are intertwined with and dependent upon the ongoing patent infringement litigation" because "the

same facts and analysis regarding the scope and validity" of the patent are relevant in both.  (*Id.* at 8-9.)  ZeroWater, in contrast, contends that the Supreme Court's decision in *Mercoid* sets out an exception to Rule 13(a) for antitrust claims, by holding that such claims are not compulsory counterclaims to a patent infringement case.  (*Id.* at 88.)  Brita argues that *Mercoid*, however, is "factually distinguishable" and does not stand "for the proposition that an anti-trust counterclaim should always be construed as permissive and not compulsory."  (*Id.* at 91.)  After reviewing the parties' arguments and the case law, the Court concludes that ZeroWater's antitrust claims in the present case are not compulsory counterclaims to the Delaware Action nor substantially similar for purposes of the first-to-file doctrine.

### a)  Impact of *Mercoid Corp. v. Mid-Continent Investment Co.*

Based on a narrow view of *Mercoid* as adopted by some courts, Brita argues that ZeroWater's antitrust claim involves "patent validity," and thus, this matter should be a compulsory counterclaim to its patent action.  (ECF No. 38 at 91.)  ZeroWater, in contrast, characterizes its antitrust case as relating to "patent misuse" and, therefore, a permissive counterclaim.  (*Id.* at 92-93.)  In *Mercoid Corp. v. Mid-Continent Investment Co.*, Mid-Continent was the holder of a patent for a heating system composed of a furnace and a separate thermostatic control device.  320 U.S. at 661.  Originally, Mid-Continent sued a Mercoid customer for patent infringement in a separate action, and though Mercoid was not a party, it directed and paid for the customer's unsuccessful defense.  *See Mid-Continent Inv. Co. v. Mercoid Corp.*, 43 F. Supp. 692, 693 (N.D. Ill. 1942).  After prevailing, Mid-Continent tried to get Mercoid to pay a licensing fee for the sale of each device, and when they refused, sued them for patent infringement.  *Id.* at 692.  Mercoid responded to this patent infringement lawsuit by asserting an antitrust counterclaim.  *Id.* The Seventh Circuit held that Mercoid was barred by the principles of res judicata from raising its antitrust counterclaim because it had failed to raise the claim when defending its customer in the

earlier proceeding.  *Mid-Continent Inv. Co. v. Mercoid Corp.*, 133 F.2d 803, 811 (7th Cir. 1942).

The Supreme Court reversed, observing that Mid-Continent's activities were "a graphic illustration

of the evils of an expansion of the patent monopoly by private engagements" and that their

litigation behavior and licensing amounted to a use of its patent "for the purpose of monopolizing

unpatented material."  320 U.S. at 665-68.  The Supreme Court also rejected that res judicata

barred Mercoid's antitrust counterclaim because it was a "separate statutory cause of action" that

was permissive under Federal Rule of Civil Procedure 13(b), instead of compulsory pursuant to

Rule 13(a).  *Id.* at 671.  The Court noted that the prior patent litigation involved different "matters

in issue or points controverted" than those involved in the antitrust counterclaim before it.  *Id.*

The Third Circuit has not spoken as to the impact of *Mercoid* on whether and when antitrust

claims are compulsory counterclaims to a patent action.  Some courts have cited *Mercoid*'s holding

as setting forth an exception to Rule 13(a) for antitrust counterclaims in patent infringement suits.

*See, e.g., Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 88 (5th Cir. 1997);

*Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536-37 (9th Cir. 1995) (strictly following *Mercoid*).

However, the *Mercoid* Court never discussed the principles upon which its decision rested, leading

some courts to conclude that its holding is limited to the facts of the case.  *See e.g., Critical-Vac

Filtration Corp. v. Minuteman International, Inc.*, 233 F.3d 697 (2d Cir. 2000) (holding that

antitrust claim was a compulsory counterclaim); *Lewis Mfg. Co. v. Chisholm–Ryder Co.*, 82 F.R.D.

745, 750 (W.D. Pa. 1979); *Rohm & Haas Co. v. Brotech Corp.*, 770 F. Supp. 928, 931 (D. Del.

1991) (*Walker-Process* claim was a compulsory counterclaim); *Am. Packaging Corp. v. Golden

Valley Microwave Foods, Inc.*, No. 94-1839, 1995 WL 262522, at *4 (E.D. Pa. May 1, 1995)

(same).[22]  Many of these courts take a narrow view of *Mercoid* by holding that antitrust claims

that can be characterized as "patent misuse"[23] are permissive counterclaims while those that go to

the heart of "patent validity" are compulsory counterclaims.[24]  *See Critical-Vac*, 233 F.3d at 703.

Antitrust claims sounding in "patent misuse" are said to involve the use of a legitimate patent for

anticompetitive means outside the scope of the grant of the patent.  *Id.*  Thus, these courts appear

to be engrafting a patent misuse distinction onto the compulsory counterclaim rule to better assist

them in assessing when an antitrust claim meets the logical relationship test.  It may be true that

an antitrust claim that can be characterized as dealing with patent misuse, and not validity, may

have a lower probability of meeting the compulsory counterclaim rule.  But the outcome from

drawing these distinctions could also be reached by using the standard "logical relationship" test.

    After reviewing the case law, the Court finds that, at minimum, *Mercoid* illustrates that

courts should exercise caution when considering whether antitrust claims are compulsory to a

patent action.  *Mercoid* is an early recognition of the fact that patent infringement claims can be

very different from antitrust claims, such that the related patent and antitrust claims should not be

---

[22] *See also Genentech, Inc. v. Regents of the Univ. of Cal.,* 143 F.3d 1446, 1455-56 (Fed. Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999); *Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222, 230 (D. Mass. 2018).

[23] Patent misuse is also an affirmative defense to a patent action, though the test for that affirmative defense seems to differ from the *Mercoid* carveout drawn by some courts.  *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1331 (Fed. Cir. 2010) (patent misuse requires "use of the patent power to impose overbroad conditions" and the alleged misconduct must "restrict[] the use of the patent . . . in one of the specific ways that have been held to be outside the otherwise broad scope of the patent grant.") (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 136-38 (1969)); *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 n.10 (Fed. Cir. 1986).

[24] The basis for this distinction stems from the Supreme Court's reasoning in *Mercoid* that barring an antitrust claim as a compulsory counterclaim subject to res judicata would place the "imprimatur on a scheme which involves the misuse of the patent privilege and a violation of the anti-trust law." *Mercoid*, 320 U.S. at 670.  The courts adopting this view believe the "evil" that the *Mercoid* court was concerned with was the misuse of a valid patent, and not the attempted enforcement of an invalid patent.  *Critical-Vac*, 233 F.3d at 703.  Why patent misuse should be considered more diabolical than attempting to enforce an invalid patent is not explained.  However, these courts have offered an additional rationale for narrowing *Mercoid*'s holding to patent misuse: "antitrust claims based on patent invalidity . . . . will generally involve the *same* factual issues as those involved in patent litigation" whereas "patent *misuse*, such as the counterclaims in *Mercoid*, are likely to involve factual issues distinct from those involved in patent infringement." *Critical-Vac*, 233 F.3d at 703.

treated as compulsory counterclaims.  There are additional examples in the law, which further illustrate the distinctiveness between patent and antitrust claims and demonstrate that they need not be decided as a pair:

1) Congress has provided different appellate paths for those two kinds of actions; appeals from patent infringement decisions go to the Federal Circuit, while appeals from antitrust decisions typically go to the regional circuit in which the district court sits.[25] *See* 28 U.S.C.S. §§ 1291-1295; 15 U.S.C.S. § 15(a).

2) Patent claims and antitrust claims are often bifurcated for trial purposes or severed.[26] *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986); *Westinghouse Air Brake Technologies Corp. v. Siemens Mobility, Inc.*, 330 F.R.D. 143 (D. Del. 2019); *see also F.T.C. v. Actavis, Inc.* 570 U.S. 136, 157 (2013) ("it is normally not necessary to litigate patent validity to answer the antitrust question").

3) Congress has a specific venue statute for patent actions that applies more narrowly, while a more expansive venue provision applies to antitrust action. *Compare* 28 U.S.C. § 1400(b), *and TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017) (patent venue is limited to the defendant's state of incorporation or where the defendant has committed acts of infringement and has a "regular and established place of business"), *with* 15 U.S.C. § 22 (providing for venue in an antitrust action anywhere the corporation is an "inhabitant," is "found," or "transacts business.").

4) The patent system is built on a trade-off.  On one side of the ledger, the prospect of exclusivity incentivizes inventors to innovate and to disclose their inventions.  On the other hand, a patent comes at a great social cost: the exclusivity given prevents competition for many years, which can impact future innovation or lead to price increases.  *See* 35 U.S.C. § 154(a)(2) (providing that the patent grant "shall be for a term" of "20 years").  Against this backdrop is a body of antitrust law that fosters the competitive environment and prevents certain conduct that threatens free markets. Both bodies of law work together to create and preserve the appropriate incentives.

---

[25] When the Federal Circuit court decides antitrust issues, it is because the "plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988).

[26] For instance, in *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986), the Federal Circuit denied a petition for writ of mandamus in which the petitioner alleged that it was improper to sever the misuse-oriented antitrust claims from the patent action.  In doing so, the Federal Circuit noted, among other reasons, why it was "now-standard" practice to sever such claims including that "consolidation would generate confusion and prejudice by intermixing conceptually-divisible issues, proof, and witnesses." *Id.* at 1085.  The court also noted judicial economy concerns, given that a patent action can conclude much earlier than an antitrust action and if the actions are consolidated, it could lead to excessive delay.  *Id.*

Congress has chosen to designate different paths for patent and antitrust law because of a policy decision it has made regarding the balance between both, so courts should be conscious to respect and maintain this balance by not automatically concluding that the similar nature of the two actions, means that they belong together.  The Court concludes that the proper analysis, in light of *Mercoid*, is a case-by-case consideration of the legal and factual bases of the claims and purported counterclaims under the "logical relationship" test, with emphasis placed on the policy balance Congress struck between patent and antitrust actions.

### b) Whether the Overlap is Sufficient for Application of the First-to-File Doctrine and Compulsory Counterclaim Rule

ZeroWater's antitrust action may touch upon some evidence or require similar witnesses as the patent action, but when assessing the relevant legal and factual bases of the patent and antitrust claims, the Court has determined that the compulsory counterclaim rule is not satisfied nor is the first-to-file "substantial similarity" test met.  Both the antitrust and patent claims have different elements with multiple limitations, so the extent of the factual overlap of what must be proven in this case is not enough.  Brita argues that "[e]very single one of ZeroWater's claims . . . hinge on this idea that Brita has a standard essential patent" but does not cite a case that holds that in order for ZeroWater to prove its patent ambush antitrust claim, ZeroWater must prove the standard essentiality of the patent.  (ECF No. 38 at 39, 82.)  ZeroWater takes the opposite position, noting that the antitrust claims are not about "whether the patent is . . . essential or not essential or valid or not, it's about the conduct they engage in regarding the use of that patent."  (*Id.* at 92, 95.)  ZeroWater states that the "validity of the patent" is not before this court, because it is "as pled . . . *presume[d]*."  (ECF No. 43 at 12 (emphasis in original).)  Further, because the relevant NSF standard requires disclosure of patents that "may" impact the standard, ZeroWater's patent ambush does not hinge on whether the patent is indeed, valid or standard essential.

Turning to the statute, Section 2 of the Sherman Act imposes liability on "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (alteration accepted) (quoting 15 U.S.C. § 2).  To prove a monopolization offense, Section 2 requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  "A claim of attempted monopolization under § 2 of the Sherman Act must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Broadcom Corp.*, 501 F.3d at 317 (quoting *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998)).  With regard to both monopolization and attempted monopolization, "[m]onopoly power is the power to control prices or exclude competition."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Plaintiffs may prove such power with two kinds of evidence: direct, such as super-competitive prices or restricted output, or circumstantial.  *Broadcom Corp.*, 501 F.3d at 307.

In the patent ambush context, the wrong that furnishes the antitrust claim is a defendant's participation in a standard-setting organization without disclosure of the patent, and then, use of the patent after competitors are locked in, to effectuate or attempt to effectuate a monopoly.  Thus, the point is not just whether Brita's '141 Patent is a standard essential patent such that it had a legal patent right to exclude others who were certified pursuant to the NSF/ANSI 53 standard; rather, this is just one small part of the evidence ZeroWater might establish to show Brita

monopolized or attempted to monopolize and the alleged antitrust harm.  This antitrust claim is about Brita "having a patent application, not disclosing it to both the standard setting organization and everybody else, [and then] sitting on that."  (ECF No. 38 at 92.)  Whether the standard setting process was moved "in a direction where it changes the standard to benefit . . . [Brita's] patent without disclosing it to anybody and then sat on that for ten years before" Brita sought to enforce its patent rights are not issues that need to be determined in either the ITC matter or the Delaware Action.  (*Id.* at 60.)

Brita argues that "the timing of Brita's conception and reduction to practice of the invention claimed by the '141 Patent is a key factual issue in both the Delaware Action and the instant case" since it is "relevant to identifying the priority date to which Brita is entitled for patent validity purposes, and . . . when, if ever, Brita had an obligation to disclose its patent rights to NSF/ANSI." (ECF No. 19-1 at 16.)  The evidence used to establish the priority date for the invention claimed by the '141 Patent *could* be considered in the instant case to show Brita had an obligation to disclose this patent to the NSF, but it does not follow that the same evidence *must* be established. ZeroWater has pled that NSF required that Brita disclose "the discovery of essential patent claims that may be required for use of a standard subsequent to its adoption" and "issuance of a patent after [NSF/ANSI 53's] adoption."  (ECF No. 1 at 13.)  NSF's Antitrust Guide also states that "[s]tandards programs must not be used as devices to . . . lessen competition."  (*Id.* at 11.)  Thus, the evidence in this patent ambush case is much broader and looks to what was kept secret and from the NSF both before and after the standard was adopted including any patent application that "may" be required for the use of the standard.  While the Delaware Action and ITC Action focus on technical issues that compare the products and the relevant timing under patent law,

ZeroWater's claims, here, will be more broadly focused on monopolistic activity and other conduct not under consideration in the patent case.

Brita also argues that the "equitable estoppel defense" that ZeroWater "pursued" and then, according to it, "abandoned," supports its position that the patent and antitrust claims are intertwined.  (ECF No. 19-3 at 2.)  However, there are evidentiary differences between an equitable estoppel defense in a patent infringement context and a patent ambush claim in an antitrust context.  In the patent ambush context, an antitrust violation may lie where a third-party, the standard-setting organization, relies upon a patent-holder's false representations.  *See Broadcom Corp.*, 501 F.3d at 314 (holding that "a patent holder's intentionally false promise" to a standard-setting organization, "coupled with [the organization's] reliance on that promise when including the technology in a standard . . . is actionable anticompetitive conduct.").  A party raising equitable estoppel as a defense to patent infringement must prove, by a preponderance of the evidence, three elements: "(1) The [patentee], who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence.  (2) The [accused infringer] relies upon that communication.  (3) And the [accused infringer] would be harmed materially if the [patentee] is later permitted to assert any claim inconsistent with his earlier conduct."  *C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (*en banc*).  Though an equitable estoppel defense may apply to successors-in-interest with privity, the defense is concerned with what the alleged infringer relied upon, and not a third-party like a standard setting organization.  *See Radio Systems Corp. v. Lalor,* 709 F.3d 1124 (Fed. Cir. 2013) (successors-in-interest where privity is established are entitled to the benefit of equitable estoppel).  Thus, evidence related to NSF's reliance on Brita's allegedly false representations for a patent ambush claim is different than the evidence needed to show reliance by ZeroWater for an equitable

estoppel defense.[27]   Further, courts have indicated that potential defenses to a matter are not relevant for purposes of the compulsory counterclaim rule.  *See, e.g.*, *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1326 (Fed. Cir. 2008) (under Rule 13(a), "the question is the extent of factual overlap. . . The mere possibility that, as a result of affirmative defenses, the first suit might involve additional issues does not obligate the defendant to assert those affirmative defenses as a counterclaim.").

### c)  Distinguishable Case Law

The Court finds that the cases Brita cites to support its conclusion—that the present case is so "intertwined with and dependent upon the ongoing patent infringement litigation" that this matter should be transferred to the District Court of Delaware—are distinguishable from the present matter.  (ECF No. 38 at 8.)  Brita points to two district court opinions as evidence that "numerous courts (including in this Circuit) have dismissed or transferred antitrust claims on the basis that they should have been brought somewhere else."  (ECF No. 26 at 4.)  The first case, *Lenovo (United States) Inc. v. Interdigital Tech. Corp*., involved a "Standards Essential Patent" Interdigital had for 3G and 4G cellular technology that incorporated a standard promulgated by the European Telecommunications Standard Institute.  No. 20-493-LPS, 2021 WL 1123101, at *1 (D. Del. Mar. 24, 2021).  The *Lenovo* case did not involve a patent ambush; instead, the contention was that Interdigital, as a standards essential patent holder, did not conform to the FRAND licensing terms that it had agreed to.  *Id.* at *13-14.  The *Lenovo* court held that the antitrust and breach of contract claims were compulsory to the patent action.[28]  *Id.* at *22.  In *Lenovo*, both

---

[27] There may be other evidentiary differences. While in the patent context, there is no laches defense because the Supreme Court closed that door in *CA Hygiene Products AB v. First Quality Baby Products LLC*, 580 U.S. 328 (2017), a delay in asserting a patent right so that a standard is locked in can be relevant to a patent ambush claim.

[28] First, the breach of contract claim was a "mirror image" of Interdigital's claim against it since it alleged Lenovo breached its requirements to license on FRAND terms.  Since Lenovo claimed that Interdigital "overdeclares" its

parties filed their actions in the District of Delaware, so the court was only considering the compulsory counterclaim rule to consolidate the cases. The first-to-file doctrine and its equitable exceptions, therefore, were not before the court as that doctrine typically applies to cases in different district courts. Nor was the court considering whether to consolidate a case with a stayed matter. The second case Brita cites, *CompuCredit Holdings Corp. v. Akanthos Cap. Mgmt., LLC*, is an unpublished District Court of Minnesota opinion. No. 10-1213 (JRT/JJK), 2011 WL 124220 (D. Minn. Jan. 14, 2011). That case involved a plaintiff who filed a separate antitrust suit in the *same* district court after that district court had ordered a venue transfer to Georgia in a separate action involving the same parties.

The other cases Brita cites—*Rohm & Haas Co. v. Brotech Corp.*, 770 F. Supp. 928, 935 (D. Del. 1991) and *Keating Fibre Int'l, Inc. v. Weyerhaeuser Co.*, 416 F. Supp. 2d 1048, 1053 (E.D. Pa. 2006)—are also distinguishable. (*See* ECF No. 26 at 6, 8.) Though, like this case, they involved the application of Rule 13(a) to actions filed in different district courts, the antitrust claims were more closely tied to the separate patent actions. Specifically, the plaintiffs brought what are referred to as *Walker-Process* claims.[29] Both *Rohm & Haas Co.* and *Keating* accepted a narrow application of *Mercoid* to patent misuse related antitrust matters, but since the *Walker-Process* claims hinged on patent invalidity, they did not fall under this *Mercoid* exception. Neither *Rohm & Haas Co.* or *Keating* went into great detail about the evidentiary overlap between the

---

patents as essential, the court noted that a patent action claims construction could implicate whether the patent was also a standard essential patent for purposes of the antitrust claim. *Id.* at *23. The court also stated that discovery on whether Interdigital intentionally deceived the standard-setting organization when it promised to license on FRAND terms may also be probative of Lenovo's defenses to the patent infringement action though did not explain further. *Id.*

[29] A *Walker-Process* claim alleges an antitrust violation for patents that were procured by fraud on the Patent and Trademark Office ("PTO"). *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965). *Walker Process* claims involve a party that knowingly asserts a fraudulently procured patent in an effort to monopolize a market, and therefore, hinge on the patent being invalid. *Id.*

parties' dueling claims or how Rule 13(a) interacts with the first-to-file doctrine. Consequently, the cases Brita cites, while of value, are not of persuasive value in this case.[30] In this matter, unlike those cases, there is sufficient distinction between the patent and antitrust actions, such that there is neither a "logical relationship" under Rule 13(a) or "substantial similarity" for purposes of the first-to-file doctrine. The Court, therefore, finds that neither to first-to-file doctrine or the compulsory counterclaim rule is applicable to this case.

### 3.      Departure under the First-to-File Doctrine

Further, even if the first-to-file doctrine applied, a departure is warranted under the following exceptions: the further development of this action than the first-filed matter in Delaware, the "rare or extraordinary circumstances," and "inequitable conduct." *See Univ. of Pennsylvania*, 850 F.2d at 976 (listing recognized exceptions to the first-to-file doctrine); *Owen*, 2023 U.S. Dist. LEXIS 36638, at *3-4 (same). Brita argues that under the first-to-file doctrine, no exception is warranted because neither case is more advanced than the other since no party has "had any opportunity to file counterclaims." (ECF No. 38 at 23.) That is not so.

The present matter has already advanced beyond the first-filed Delaware Action. Though an answer to the complaint along with any potential counterclaims has not been filed in either matter, in the present case, Brita has had an opportunity to file a motion to dismiss, with extensive briefing filed by both parties and oral arguments. ZeroWater has not been afforded a similar opportunity in the Delaware Action. At this juncture, there are no dueling proceedings that could lead to inconsistent judgments because the Delaware Action has been "indefinitely stayed for years

---

[30] Though Brita suggests that ZeroWater's antitrust case hinges on patent validity and the scope of the patent, it has not cited to legal authority indicating that in a patent ambush claim, it is necessary to litigate patent validity to answer the antitrust question. Thus, Plaintiff's claims may also be distinguishable from the *Walker-Process* claims in those cases, and more likely to be a "patent misuse," if this court were to utilize that distinction.

following Brita's Notice of Appeal from the ITC Action to the Federal Circuit."  (ECF No. 48-1 at 2.)  If and when the Delaware Action may restart is undetermined, as exhaustion of that proceeding and appeals could be years away, and there is a chance that the Delaware Action may never go forward.  (ECF No. 38 at 65) ("[I]f Brita exercises its appeal rights, not only will it take years, but there's a very significant chance this case will never go to Delaware . . . [because] [i]f the Federal Circuit says the patent is invalid, that is . . . res judicata.").

The Court also concludes that the facts and procedural posture of this case are of the type of rare or extraordinary circumstances, that support departure from the first-to-file doctrine.  As this Court previously noted in *MLI et al. v. GSK*, "[t]here are cases suggesting that the first-to-file doctrine should not be used to subvert resolution of a case on the merits," but did not find departure warranted in that case based on the lack of compelling grounds to suggest judicial expediency would be advanced.[31]  Civ. No. 23-429, 2023 WL 3739064, at *5 (E.D. Pa. May 30, 2023).  In this case, while Brita has had an opportunity to file a motion to dismiss, ZeroWater cannot do the same in the Delaware Action because that case is stayed and will remain stayed for an indeterminate period of time.  Brita nonetheless asks this Court to consolidate ZeroWater's antitrust claim as a compulsory counterclaim to the Delaware Action, which will also subject ZeroWater's antitrust claim to that indefinite stay.  Brita will then be able to continue litigating the patent claim it brought against ZeroWater in the ITC Action, while ZeroWater will not be able to pursue its ripe antitrust

---

[31] *See also Chavez,* 836 F.3d at 234 (the first-to-file doctrine should not be imposed in a manner which would ensure the "courthouse doors" "remain closed" and therefore, dismissal with prejudice was an abuse of discretion); *Univ. of Pennsylvania*, 850 F.2d at 971 (noting that if the first-to-file doctrine was invoked, prompt resolution would be subverted, while emphasizing the first-filer's attempt to sidestep precedent as a basis for departing from the rule); *Kerotest Mfg. Co. C-O-Two Fire Equip. Co.*, 189 F. 2d 31, 34 (3d Cir. 1951) (first-filed action dismissed because second-filed action involved party who could not be joined in each); *Crosley Corp. v. Westinghouse Electric & Mfg. Co.*, 130 F. 2d 474 (3rd Cir. 1942), *cert. denied*, 317 U.S. 681 (1942) (where two parallel cases were instituted one day apart, and therefore, potentially anticipatory, noting the first-to-file doctrine may be defeated when the second-filed action would provide more expeditious relief).

40

claim until the ITC litigation and appeals are exhausted.  ZeroWater's position is that Brita is using the compulsory counterclaim rule as procedural gamesmanship to freeze ZeroWater's antitrust claim while it pursues its patent claim, which should be considered by this Court, particularly in light of ZeroWater's allegations of Brita's decades-long patent ambush scheme.  (ECF No. 48-1.)  If the Court adopts Brita's position, the effect will be to allow that alleged patent ambush scheme to proceed, while ZeroWater will simultaneously be prevented from stopping the ongoing harm, and pursuing its claims, along with injunctive relief.  The court finds this is precisely the type of "inequitable conduct" contemplated by the first-to-file rule.

In addition, transferring this case only to be subjected to an indefinite stay, when it could be actively litigated in this Court, without Brita ever having to prove that stay is warranted while it simultaneously pursues the ITC action amounts to "rare or extraordinary circumstances" that support a departure.  The Court finds that the first-to-file rule does not require that this case be forced into an indefinite stay while Brita pursues its claims in the ITC action.  Therefore, this Court concludes that ZeroWater's choice to bring its case here, when a separate patent action was filed first in the District of Delaware, does not render venue improper or warrant a transfer of this case to the District of Delaware.

### C.    Section 1404(a) Transfer Criteria

Lastly, Brita argues that even if personal jurisdiction and venue are proper, the Court should nonetheless exercise its discretion and transfer this case to the District of Delaware under 28 U.S.C. § 1404(a).  Pursuant to Section 1404(a), a district court may also transfer any civil action to any other district where it might have been brought "for the convenience of the parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  Courts are afforded broad discretion to determine whether transfer is justified under Section 1404(a), though Defendants as the movants,

41

have the burden of establishing the need.  *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  Since the parties do not dispute that this action could have been brought in the District of Delaware, the Court must analyze twelve public and private factors to determine which forum is most appropriate to consider this case.  *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Further, "the plaintiff's choice of forum should rarely be disturbed, unless the balance of factors is strongly in favor of the defendant." *Lony v. E.I. DuPont de Nemours & Co.*, 886 F.2d 628, 632 (3d Cir. 1989).  *See also Jumara*, 55 F.3d at 879 ("[T]he plaintiff's choice of venue should not be lightly disturbed.").

The private interest factors include (1) the plaintiff's forum preference; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses— only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records—also limited to the extent that the files could not be produced in the alternative forum.  *Id*. at 879.  The public interest factors include (1) the enforceability of the judgment; (2) the practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* at 879-80.

The Court carefully considers each of the *Jumara* factors below.  Out of the twelve (12) factors, the Court has determined that six (6) factors are essentially neutral to the transfer analysis, five (5) factors weigh against transfer, and only one factor, Defendant's choice of forum, favors transfer.  On balance, the Court finds that the *Jumara* factors weigh against transfer and in favor

of keeping the matter in this District.  Accordingly, this Court finds that Brita has failed to sustain its burden to show that a transfer is warranted in the "interest of justice" under 28 U.S.C. §1404(a).

### 1.    Private Interest Factors

The balancing of the private *Jumara* factors weighs against transfer and in favor of keeping this case, here, in the Eastern District of Pennsylvania.

First, generally a plaintiff's choice of a proper forum, particularly in its home state, "is a paramount consideration in any determination of a transfer request . . ."  *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *see also Infinity Computer Prods., Inc. v. Toshiba Am. Business Solutions, Inc.*, Civ. No. 12-6796, 2018 U.S. Dist. LEXIS 31938, at *10 (E.D. Pa. Feb. 27, 2018).  In this case, ZeroWater has chosen Pennsylvania where it is headquartered and where it alleges it was harmed, and therefore, its choice of forum is entitled to "paramount consideration" on its separate antitrust claim.  *Shutte*, 431 F.2d at 25.  Thus, the plaintiff's forum preference weighs against transfer.  Second, the Court recognizes that Defendants would prefer to litigate in the District of Delaware, which weighs in favor of transfer.

Third, ZeroWater's claims arose in multiple fora but not primarily in the District of Delaware.  Brita argues that "none of the operative facts took place" in this District.  (ECF No. 19-4 at 22.)  In contrast, ZeroWater argues that this District "has significant connections" to this action, and it "suffered and continues to suffer antitrust injuries in this District."  (ECF No. 25 at 30.)  Antitrust actions are not like an automobile accident where it is readily identifiable where the operative facts of an action occurred.  *See Lepage's, Inc. v. 3M*, No. CIV. A. 97-3983, 1997 WL 587355, at *5 (E.D. Pa. Sept. 10, 1997); *Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 291 F. Supp. 252, 260 (E.D. Pa. 1968).  Also, there is relatively little guidance in the case law regarding how to determine which forum(s) constitute where the disputes, events, and

transactions involved in an antitrust case arose for the purposes of a Section 1404(a) transfer analysis.  When addressing this same issue, the District of New Jersey found "[t]here is, generally, a dearth of case law on the question of where an antitrust claim arises for purposes of a *Jumara* analysis, and the Third Circuit has yet to speak on this issue." *Church & Dwight v. Mayer Laboratories, Inc.*, No. 08-5743 (FLW), 2010 WL 3907038, at *9 (D.N.J. Sept. 28, 2010). Through its own research, this Court has found that observation remains accurate.  In this District, courts tend to evaluate where the anticompetitive conduct occurred as where the claim arises.  *See, e.g.*, *TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 752 F. Supp. 2d 517, 538-39 (E.D. Pa. 2010) (finding conduct occurred in the Eastern District of Pennsylvania, where the plaintiff's efforts to sell to the city and where the defendant made representations and a sale to the city occurred, and in the District of Massachusetts, finding the defendant's failure to make a payment to the plaintiff occurred at the defendant's principal place of business); *Lepage's, Inc. v. 3M*, No. CIV. A. 97-3983, 1997 WL 587355, *5 (E.D. Pa. Sept. 10, 1997) (finding cause of action arose in Minnesota at the defendant's headquarters, where the anticompetitive policy would have been formulated, and across the country, where retailers allegedly stopped carrying the plaintiff's products due to the defendant's alleged anticompetitive activities).  *See also Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 291 F. Supp. 252, 260 (E.D. Pa. 1968) (finding "place of injury" did not automatically equate to "where the claim arose" for purposes of venue because this would give antitrust plaintiffs venue in any district where a plaintiff purchased an item at a price illegally inflated by an alleged conspiracy).

In this case, according to ZeroWater, the damages were felt in Pennsylvania, and while "some of the conduct actually took place in Pennsylvania" as well as in Michigan and California, "nothing has occurred in Delaware."  (ECF No. 38 at 43; ECF No. 19-4 (inventor declaration

stating "[t]he conception and reduction of the '141 Patent occurred in . . . California" with the patent application filed in Virginia); ECF No. 19-5 (declaration stating that Brita participated via conference call from California in NSF task force that led to the adoption of the NSF/ANSI 53 standard); ECF No. 25 at 30 (the NSF committee meetings were held in Michigan).)  Further, The Clorox Company, the "ultimate parent company" of Brita LP, is a Delaware corporation with its principal place of business in Oakland, California, while Brita LP is an Ontario limited partnership organized under the laws of Canada and headquartered in Neuchatel, Switzerland.  (ECF No. 19-2 at 1-2.)

California—as the headquarters of The Clorox Company (where an alleged anticompetitive policy could have been formulated), as the site of conception and reduction for the '141 Patent, and as the location where Brita participated in the NSF task force (where the alleged anticompetitive scheme was instituted)—is where several of the operative facts occurred. However, Pennsylvania, and perhaps Virginia or Switzerland, still have a connection to this case, while Delaware's only touchpoints are minimal.  Delaware's nexus to this antitrust case is that it is the place of incorporation of two of the three parties, including ZeroWater and The Clorox Company, and it is where Brita's patent action was filed.[32]  The Court does not find that the cause of action arose in a singular location to which this case should be transferred.  Thus, the "where the causes of action arose" factor weighs against transfer.

---

[32] The narrow venue provision of 28 U.S.C. § 1400(b) limited Brita's choice of where it might file a patent action against ZeroWater, but Brita does not argue that the patent action could not have been brought in this District.  It chose to file its patent claim in the District of Delaware based on a litigation decision it made.  Nothing precludes ZeroWater from similarly choosing the place and manner in which it brings its antitrust action based on the requirements of 15 U.S.C. § 22.  The restrictions on venue in patent cases does not give Delaware a stronger connection. (ECF No. 1 at 15.)

Fourth, nothing in the record suggests that any party's financial condition might impact its ability to litigate in either fora.  Given the proximity between the two venues, it cannot be said that either forum will cause greater inconvenience to the parties in the aggregate.  Therefore, the "relative convenience of the parties" factor is neutral.  Fifth, Brita states that the District of Delaware will be more convenient because witnesses that will have to be called in the Delaware Action, will be called in this action.  But Brita ignores that the convenience of witnesses is only considered "to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879.  Defendant has "the burden of identifying witnesses who would be unavailable at trial." *Brenner v. Consol. Rail Corp.*, No. 09-cv-1574, 2009 WL 2710241, at *3 (E.D. Pa. Aug. 26, 2009).  It has not sustained this burden, as nothing in Brita's Motion suggests that witnesses might be unavailable for trial in the Eastern District of Pennsylvania.  Therefore, the "convenience of the witnesses" factor is also neutral.

Lastly, in evaluating the private factors, a court considers the location of books and records only "to the extent that the files could not be produced in the alternative forum." *Jumara*, 55 F.3d at 879.  Brita argues that the "Court should dismiss or transfer to Delaware because there is a very real risk that the full ITC record will not be available in this venue."  (ECF No. 41 at 11.)  The ITC must protect confidential information submitted to the Commission or exchanged during discovery in a Section 337 Investigation.  *See* 19 U.S.C. § 1337(n)(1).  While there is a statutory exception for district courts that enter a mandatory stay under 28 U.S.C. § 1659 for pending parallel patent infringement actions, Brita claims "nothing in 19 U.S.C. § 1337 or 28 U.S.C. § 1659 authorizes the ITC to transfer confidential information to a court other than the companion case in which a § 1659(a) stay was entered."  (*Id.*)  It then states that the ITC has "traditionally been reluctant to release confidential information where not absolutely necessary" acknowledging that the ITC

*could* release this information, even if "reluctant" to do so. *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986). The "authority" it cites for this "reluctance" are either administrative decisions or inapposite cases. (*Id.*); *see, e.g.*, *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 547-48 (Fed. Cir. 1986) (ITC refusal to declassify confidential information for a foreign court proceeding). Section 1659 says "nothing about other district courts being precluded from enjoying that same benefit nor is that benefit necessary to the commencement of a separate, district court action." (ECF No. 43 at 11.) Yet even assuming that the ITC would not permit the record here, Brita provides no reason why it is even necessary to have the entire ITC record since it is not binding on this Court and independent discovery of third parties could occur. (ECF No. 38 at 54.) This Court sees no reason as to why a protective order cannot be entered in this action to protect any kind of proprietary and confidential material from the parties or other potential non-parties to this litigation. (*Id.*) Thus, the "location of books and records" factor is neutral.

### 2. Public Interest Factors

The balancing of the public *Jumara* factors weighs against transfer and in favor of keeping this case, here, in the Eastern District of Pennsylvania.

First, a judgment rendered in either this District or the District of Delaware could easily be registered and then enforced in another district. Therefore, the "enforceability of the judgment factor" is neutral. Second, typically "[t]he presence of a related case in the transferee forum is a strong factor favoring transfer." *Schlenker v. Immucor, Inc.*, No. CIV.A. 2:09CV04297-J, 2009 WL 5033972, at *5 (E.D. Pa. Dec. 22, 2009). Courts transferring cases in those circumstances do so in light of the Supreme Court's warning that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads

to the wastefulness of time, energy and money that 1404(a) was designed to prevent." *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960).  However, as explained above, this matter and the Delaware Action are not two cases involving the same issues.  Further, in this matter, judicial economy would not be advanced by transferring this case to the District of Delaware because to do so would mean this matter would be subjected to an indefinite and lengthy stay.  Thus, the "practical consideration of trial" factor weighs against transfer.

Third, regarding the administrative difficulties associated with proceeding in either District, the Court is required to evaluate this factor in light of the relative docket congestion of the for a.  *See Jumara*, 55 F.3d at 879.  ZeroWater argues that the District of Delaware is "substantially more congested than this District."  (ECF No. 25 at 31-32.)[33]  In the twelve-month period ending on March 31, 2023, there were 271 weighted filings per judge and 6,944 pending cases in this District, and 741 weighted filings per judge and 1,895 pending cases in the District of Delaware.[34]  Court congestion does weigh against transfer as the District of Delaware currently faces a heavier caseload per judge than this Court.  Thus, the "relative administrative difficulty" factor weighs against transfer.

Fourth, although both fora have a strong interest in handling matters concerning its resident businesses, this District has a stronger interest.  ZeroWater alleges that a significant effect of Brita's alleged scheme was felt on a Pennsylvania business and Pennsylvania citizens.  ZeroWater

---

[33] "The District of Delaware has only four active judges, compared to twenty-one active judges in this District, including four appointed in the last year.  Moreover, the District of Delaware had 534 pending cases and weighted filings of 834 per judgeship as of September 2022, compared to just 427 and 273 in this District.  This Court should not transfer this complex matter to a District that is already overly congested and where several judges from this District already sit by designation to address the case backlog."  (ECF No. 25 at 31-32.)

[34] *See* United States District Courts — National Judicial Caseload Profile, U.S. COURTS, https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2023-tables [https://perma.cc/U9MD-AP74] (last accessed January 29, 2024).

claims that as a result of Brita's alleged anticompetitive scheme, it had to explore "completely chang[ing] the way we make this product, sell the product," and that it "los[t] . . . tremendous amounts of business" and faced "an existential threat to shut down their business in the U.S." which "was felt particularly by a lot of employees right up the road." (ECF No. 38 at 51-52; ECF No. 1 at 7.) In comparison, Delaware is the place of incorporation of two of the three parties, including ZeroWater and The Clorox Company. *But see Teva Pharm. Indus. Ltd. v. Astrazeneca Pharms. LP*, No. 08-cv-4786, 2009 U.S. Dist. LEXIS 75257, at *17 (E.D. Pa. 2009) (denying transfer where transferee state was where defendant was incorporated because the "court fails to see how a patent holder's state of incorporation necessarily has a greater interest in a patent suit than does another state in which the patented product is also commonly found"). Therefore, the "local interest" factor weighs against transfer. Fifth, neither party asserts a position for the "public policies of the fora" factor, and the Court is not aware of any strong public policy interest creating a preference for one forum over the other. Thus, this factor is neutral.

Lastly, the final public factor to be evaluated focuses on whether judges in one of the districts would have greater familiarity with the applicable state law, particularly in diversity cases. *See Jumara*, 55 F.3d at 879. While ZeroWater's claims sound primarily in federal antitrust law, ZeroWater does assert violations of Pennsylvania common law for unfair competition and two unspecified state law violations for breach of contract and breach of the covenant of good faith and fair dealing. (*See generally* ECF No. 1.) A Pennsylvania court would have greater familiarity with a violation of Pennsylvania common law. Otherwise, any federal judge is readily equipped to handle issues of federal and state law, and neither party argues this factor. Therefore, the "familiarity with the applicable state law" factor is also neutral.

**IV.      CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer (ECF No. 19) is denied.  An appropriate order consistent with this opinion follows.

/s. Hon. Kelley B. Hodge

_____

**HODGE, KELLEY B., J.**