# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ZERO TECHNOLOGIES, INC.

*Plaintiff*

v.

Case No. 2:22-cv-03989-KBH

THE CLOROX COMPANY
AND BRITA, LP,

*Defendants*

**PLAINTIFF ZERO TECHNOLOGIES, INC.'S
BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
<u>JUDGMENT ON THE PLEADINGS AND REQUEST FOR JUDICIAL NOTICE</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT ........................................................................................................2

    A.   Defendants should not be permitted to abuse the concept of judicial
        notice to subvert the legal standard for Rule 12 dispositive motions
        by injecting disputed facts not found in ZeroWater's Complaint............................2

    B.   ZeroWater plausibly alleges anticompetitive conduct by Defendants....................4

        1.   The Complaint sets forth plausible allegations of conduct that
               is anticompetitive on its face.........................................................................4

        2.   ZeroWater pleads plausible Section 2 claims under *Rambus*,
               though *Rambus* is distinguishable because it deals with
               otherwise inapposite technological interoperability standards ...................8

        3.   ZeroWater pleads plausible Section 2 claims under *Broadcom*,
               though the defendant's conduct in *Broadcom* was less
               egregious than Defendants' conduct here ...................................................14

    C.   ZeroWater plausibly alleges monopoly power or, in the alternative,
        a dangerous probability of achieving monopoly power.........................................17

    D.   ZeroWater plausibly alleges antitrust injury.........................................................19

    E.   ZeroWater plausibly alleges that Defendants breached a contract
        of which ZeroWater is a third-party beneficiary....................................................21

    F.   ZeroWater plausibly alleges a breach of the duty of good faith and
        fair dealing .............................................................................................................23

III.  CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Actividentity Corp. v. Intercede Group PLC*,
   No. C 08-4577, 2009 WL 8674284 (N.D. Cal. Sept. 11, 2009) ..................................... 8-9

*Allied Tube v. Indian Head, Inc.*, 486 U.S. 492 (1988) ...................................................5

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)......................5

*Amphastar Pharmaceuticals Inc. v. Momenta Pharmaceuticals, Inc.*,
   850 F.3d 52 (1st Cir. 2017).................................................................... 12, 15-16

*Amphastar Pharm. Inc. v. Momenta Pharm., Inc.*,
   297 F. Supp. 3d 222 (D. Mass. 2018) ....................................................... 12-13

*Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...................21, 22

*Apple Inc. v. Samsung Electronics Co. Ltd.*, No. 11-CV-01846,
   2011 WL 4948567 (N.D. Cal. Oct. 18, 2011).................................... 5, 8, 21-22

*Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846,
   2012 WL 1672493 (N.D. Cal. May 14, 2012) .................................................11

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ........................... 4, 5, 11, 14-17

*Brown v. Wexford Health Sources, Inc.*, No. 16-CV-1680,
   2018 WL 3156856 (W.D. Pa. June 28, 2018)...........................................23 n.14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................................21

*CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053 (Pa. Super. Ct. 1999) ......................................23

*Brown v. Wexford Health Sources, Inc.*, No. 16-CV-1680,
   2018 WL 3156856 (W.D. Pa. June 28, 2018)...........................................23 n.14

*G+ Comms., LLC v. Samsung Electronics Co. Ltd.*, No. 2:22-CV-00078,
   2023 WL 3167416 (E.D. Tex. Apr. 28, 2023) ...........................................21, 22

*Hu v. Herr Foods, Inc.*, 251 F. Supp. 3d 813 (E.D. Pa. 2017)......................................................24

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007)..........8 n.7, 16

*In re Innovatio IP Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925 (N.D. Ill. 2013)...........21, 22

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).................................................2

*Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716 (Pa. Super. Ct. 1996)......................................23

## TABLE OF AUTHORITIES (continued)

**CASES (continued)**

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) .......................................................2

*Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-723,
    2016 WL 1464545 (D. Del. Apr. 13, 2016)..............................................4, 16

*Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)................................17

*Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023 (W.D. Wash. 2012)............15

*Pesa v. Scandinavian Airlines Syst.*, No. 2:19-CV-20415,
    2021 WL 1660863 (D.N.J. Apr. 27, 2021) ........................................................24

*Philadelphia Taxi Association v. Uber Technologies*,
    886 F.3d 332 (3d Cir. 2018)...........................................................19-20, 20-21

*Provepharm, Inc. v. Akorn, Inc.*, No. 17-CV-7087,
    2019 WL 2443185 (E.D.N.Y. June 11, 2019) ...........................................8, 13

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008).............................................4, 8-13

*In the Matter of Rambus, Inc.*, No. 9302, 2006 FTC LEXIS 60,
    2006 WL 2330117 (F.T.C. Aug. 2, 2006) .................................................16-17

*Research in Motion v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008)..............5

*Ross v. Canada Life Assurance Co.*, No. Civ. A. 94-5557,
    1996 WL 182561 (E.D. Pa. Apr. 16, 1996) .......................................................23

*St. Clair v. Citizens Financial Group*, 340 F. App'x 62 (3d Cir. 2009) ...............18 n.13

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*,
    181 F.3d 410 (3d Cir. 1999).................................................................................2

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008)........23 n.14

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267 (3d Cir. 1995) .........11

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996) .............3

*United States v. Dentsply, Inc.*, 399 F.3d 181 (3d Cir. 2005).........................17, 18, 19

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .......................17

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).................................................17

iv

**TABLE OF AUTHORITIES (continued)**

**CASES (continued)**

*Wolfington v. Reconstructive Orthopaedic Assoc. II PC*, 935 F.3d 187 (3d Cir. 2019)..................2

*Wulf v. Bank of America, N.A.*, 798 F. Supp. 2d 586 (E.D. Pa. 2011)..................................... 23-24

*Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997)....................1 n.1


**RULES**

Fed. R. Civ. P. 12(b)(6).............................................................................................................2, 3

Fed. R. Civ. P. 12(c) ............................................................................................................2, 3, 24

Fed. R. Civ. P. 12(d) ................................................................................................................. 2-3

Fed. R. Civ. P. 56..........................................................................................................................3

## I.   INTRODUCTION

Plaintiff Zero Technologies, Inc. ("ZeroWater") brought this case seeking redress for Defendants' anticompetitive conduct in (1) participating in the committees that drafted the current version of the NSF/ANSI 53 lead-reduction standard adopted in 2007 while (2) breaching their obligation to disclose to NSF their efforts to patent all commercially viable technologies that could satisfy that standard, and (3) lying in wait for years until ZeroWater and other competitors were locked into technologies implementing the standard, then launching patent-based proceedings at the International Trade Commission ("ITC") and in federal court to try to exclude those competitors entirely from the relevant market for NSF/ANSI 53 lead-certified high-performance gravity-fed water filters. Defendants have now moved for judgment on the pleadings as to four of the five counts in ZeroWater's Complaint, including the counts for monopolization and attempted monopolization under Section 2 of the Sherman Antitrust Act.

As argued below, the Complaint pleads facts that raise a plausible right to relief as to all the challenged claims, so Defendants' motion should be denied on the merits. But in addition, Defendants do not even seek dismissal of Count III, which states a claim for unfair competition under Pennsylvania law. And the tort of unfair competition includes the same anticompetitive conduct as the antitrust claims, so even if Defendants' motion had merit, this case would still proceed through the same full discovery to summary judgment or trial on Count III.[1] In conjunction with the analysis of the merits provided below, this is a strong practical reason for the Court to deny Defendants' dilatory motion and take up the legal issues after the close of discovery, with the benefit of a full factual record.

---

[1] *See Yeager's Fuel, Inc. v. Pa. Power & Light Co*., 953 F. Supp. 617, 667-68 (E.D. Pa. 1997) (noting conduct that violates federal antitrust statutes also constitutes Pennsylvania common-law unfair competition).

## II.    ARGUMENT

### A.    Defendants should not be permitted to abuse the concept of judicial notice to subvert the legal standard for Rule 12 dispositive motions by injecting disputed facts not found in ZeroWater's Complaint

In deciding a Rule 12(c) motion, the Court applies the same standard as under Rule 12(b)(6)—viewing the facts presented in the pleadings and drawing all inferences from those facts in the light most favorable to the nonmoving party—and the Court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents *if* the claims are based on those documents. *Wolfington v. Reconstructive Orthopaedic Assoc. II PC*, 935 F.3d 187, 195 (3d Cir. 2019). By that standard, Defendants' "Request for Judicial Notice" (Doc. 67) renders their motion for partial judgment on the pleadings a stealth motion for summary judgment, though discovery has barely begun. Defendants have submitted, among other things, voluminous materials from their ITC proceeding against ZeroWater and others, and effectively ask the Court to make findings of fact in Defendants' favor based on those materials, regardless of what ZeroWater's Complaint says.[2]

The Third Circuit has held that examining evidentiary materials from another proceeding converts a Rule 12 motion into a motion for summary judgment. *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.,* 181 F.3d 410, 427 n.7 (3d Cir. 1999) (citation omitted); *see also Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("While a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.") (citing *Southern Cross*), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010). And Rule 12

---

[2] *See, e.g.*, Def. Br. at 4 (attempting to rely on witness testimony in ITC proceedings to contradict the allegations of the Complaint).

expressly provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). That Defendants are asking the Court to rely on several hundred pages of evidentiary materials from another proceeding is therefore, by itself, sufficient reason to deny the instant motion without prejudice to Defendants' ability to renew their arguments at the summary judgment stage after the conclusion of discovery.[3]

Defendants' reliance on cherry-picked pages from the record of the ITC proceeding to suggest that ZeroWater's antitrust claims were somehow already litigated there is likewise inappropriate. (Defendants' Brief ("Def. Br.") at 4-5.) ZeroWater's decision not to ultimately pursue a particular defense in the ITC action, and to focus instead on proving patent invalidity there, is not the same as having fully and finally litigated the issue of Defendants' anticompetitive conduct—especially given that ZeroWater did not have the benefit of full discovery before the ITC, such as it will have in this civil action.[4] Defendants have not even attempted to make a properly supported argument from res judicata or collateral estoppel principles. And if they did try to make any such argument, it would fail, because decisions of the ITC have no precedential effect in a federal district court. *See, e.g.*, *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568-69 (Fed. Cir. 1996).

---

[3] As explained below on page 10, one of the testimonial excerpts submitted by Defendants is not even what Defendants represent it to be.

[4] ZeroWater did not have the "benefit of extensive discovery in the ITC action" (Def. Br. at 1) in preparing the Complaint here. Antitrust counsel for ZeroWater had access only to public information and did not view or use confidential ITC materials to draft the Complaint in this case. Nor was discovery before the ITC as broad as claimed by Defendants. For example, none of the parties before the ITC searched for or produced email communications. (*See* **Ex. 1** hereto (ITC discovery stipulation), at 7, ¶ 22.)

Finally, Defendants' "Request for Judicial Notice" is also improper because it appears to have been separately filed to evade this Court's page limitation on briefs, with Defendants granting themselves an additional eight pages of argument beyond the 25 pages already consumed by their brief in support of their motion for partial judgment on the pleadings.[5]

**B.   ZeroWater plausibly alleges anticompetitive conduct by Defendants**

A primary question before this Court is whether ZeroWater has plausibly pled a violation of Section 2 of the Sherman Act, including anticompetitive conduct. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-08, 318-19 (3d Cir. 2007); *see also Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-723, 2016 WL 1464545, *1 (D. Del. Apr. 13, 2016). Defendants sidestep the appropriate inquiry into their anticompetitive conduct and instead insist that ZeroWater's claims must fail just because the facts alleged here do not precisely mirror those alleged in two other standard-setting organization ("SSO") cases, *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), and *Broadcom*. But Defendants cite no authority for the proposition that *Rambus* and *Broadcom* narrowly circumscribe the *only* SSO-related misconduct that might run afoul of the antitrust laws. And, in any event, the facts alleged here—which are in significant ways more egregious than the facts of those cases—do plainly constitute anticompetitive conduct in violation of Section 2, consistent with the reasoning of both *Rambus* and *Broadcom*.

**1.   The Complaint sets forth plausible allegations of conduct that is anticompetitive on its face**

SSOs are inherently anticompetitive; under antitrust law, competitors are allowed to enter into agreements—namely standards—that limit competition only because of requirements

---

[5] Notwithstanding the procedural impropriety of Defendants' separate argumentative "Request for Judicial Notice," ZeroWater has no objection to the Court's consideration of Exhibits A, B, or D thereto, since those documents are integral to and relied on in the Complaint. The remaining exhibits submitted by Defendants are objectionable for the reasons given above, and to consider them would require converting Defendants' motion into one for summary judgment.

designed to ensure that those standards do not have anticompetitive effects. "A standard setting organization … can be rife with opportunities for anticompetitive activity." *Broadcom*, 501 F.3d at 308 (quoting *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982)). Thus, the "only" reason "private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws [is] … on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits," and in the presence of "meaningful safeguards" that "prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Id*. at 310 (quoting *Allied Tube v. Indian Head, Inc.*, 486 U.S. 492, 506-07, 501 (1988)). Since "standards implemented by standard setting organizations, without the proper safeguards, are inherently anticompetitive[,] [i]t follows that when an entity sidesteps these safeguards in an effort to return the standard to its natural anti-competitive state, anticompetitive effects are inevitable." *Apple Inc. v. Samsung Electronics Co. Ltd.*, No. 11-CV-01846, 2011 WL 4948567, *6 (N.D. Cal. Oct. 18, 2011) (quoting *Research in Motion v. Motorola, Inc.*, 644 F. Supp. 2d 788, 794 (N.D. Tex. 2008)).

Here, ZeroWater has alleged the existence of such safeguards, Defendants' commitment to abide by them, and breach of that commitment by deception. Specifically, ZeroWater has alleged that "NSF is an SSO that, among other things, propagates standards for achieving acceptable contaminant reduction in drinking water." (Compl. ¶ 27.) The current version of NSF/ANSI 53, the relevant standard for the efficacy of water filtration in removing dangerous contaminants—notably lead—was adopted in 2007.[6] (*Id*. ¶¶ 31, 52, 58.) Defendants' employees

---

[6] This brief frequently refers to the NSF/ANSI 53 standard as a whole for brevity, but such references should be understood to indicate the part of the standard applicable to reduction of lead in drinking water. Likewise, references to NSF/ANSI 53-certified products should be

were among the individuals who developed and approved NSF/ANSI 53 from 2004-2007. (*Id*. ¶¶ 52-67.) Compliance with NSF/ANSI 53 is commercially critical and is mandated by two states. (*Id*. ¶¶ 33, 92-94.) Several months after the NSF/ANSI 53 standard was adopted in February 2007, Defendants filed the '372 Application, followed by the '141 Application; both applications expressly reference the 2007 version of the standard. (*Id*. ¶¶ 72, 79.)

Yet, at no time did Defendants ever disclose that they were considering, working on, or otherwise exploring the '372 Application, applications stemming therefrom, the '141 Patent, or any other patent that that could effectively prohibit other companies from marketing products that complied with the new health standard Defendants helped to shape. That conduct is in direct violation of procompetitive SSO policies that NSF members—like Defendants—were bound by, including ANSI Essential Requirements: Due process requirements for American National Standards ("ANSI Essential Requirements"). (*Id*. ¶ 41.) The ANSI Essential Requirements include a section titled ANSI Patent Policy–Inclusion of Patents in American National Standards ("ANSI Patent Policy"), which has been expressly adopted and implemented by NSF. (*Id*.) The ANSI Patent Policy requires participants in the standard setting process to provide assurances that either the "party does not hold and does not currently intend holding any essential patent claim(s)" or that it will license those rights at no cost or FRAND terms and rates in the event the standard is enacted notwithstanding the existence of a standard essential patent." (*Id*. ¶ 45.) "For the NSF/ANSI 53 Standard specifically, NSF certified that the process complied with the ANSI Patent Policy at the time it was adopted on February 5, 2007." (*Id*. ¶ 50.) "In addition to the actual requirements of NSF and ANSI … it is generally well-known, and was known or should

_____

understood as referring to high-performance gravity-fed water filters certified for lead reduction in drinking water under NSF/ANSI 53.

have been known by Brita, that SSOs operate under policies whereby patent disclosure is required." (*Id.* ¶ 51; *see also* ¶ 7.)

Defendants misleadingly assert that "ZeroWater relies upon a 2013 version of NSF's Standards Development and Maintenance Policies" and that "ZeroWater alleges no facts to support a plausible inference that NSF had such a policy from 2005 to 2007, when ZeroWater alleges that Brita 'used its participation in NSF task groups to gain timely information about the proposed standard' and failed to disclose its patent rights." (Def. Br. at 16.) But paragraph 42 of the Complaint shows that ZeroWater did not "rely" on the 2013 version of the NSF Standards Development and Maintenance Policy; rather, ZeroWater alleges there that NSF's Standards Development and Maintenance Policies "were first adopted in May 1984 and **last revised in September 2013**[.]" (Compl. ¶ 42 (emphasis added).) The Complaint further expressly alleges that "[u]pon information and belief, prior versions of the NSF's Standards Development and Maintenance Policies in effect at the time Brita participated in the task forces related to the adoption of the NSF/ANSI 53 Standard, expressly included ANSI's Patent Policy in the text of NSF's Policies." (*Id.*)

In fact, Defendants now admit that they began developing the claimed subject matter of the '141 Patent in **May 2006**, while the current version of NSF/ANSI 53 was still in development and before the 2007 final adoption vote. (Def. Br. at 3.) Nevertheless, Defendants never disclosed the '141 Patent or any other patent and instead waited until Christmas Eve, 2021—nine years after the '141 Patent issued—to file infringement cases against five competing manufacturers of gravity-fed water filters marketed as compliant with NSF/ANSI 53's lead standard, seeking to stop them from selling their products and require them to pay Brita

damages.[7] These facts alone plausibly allege a violation of Section 2 of the Sherman Act

sufficient to warrant discovery into Defendants' strategy of pursuing a patent that would engulf

the relevant NSF/ANSI standard while participating in the SSO task forces that developed that

very standard.

> ## 2. ZeroWater pleads plausible Section 2 claims under *Rambus*, though *Rambus* is distinguishable because it deals with otherwise inapposite technological interoperability standards

Plaintiff plausibly alleges anticompetitive conduct under *Rambus* arising from

Defendants' failure to disclose its patent intentions and rights to NSF. First, *Rambus* did not

address pleading standards for Section 2 claims. *See, e.g.*, *Provepharm, Inc. v. Akorn, Inc.*, No.

17-CV-7087, 2019 WL 2443185, *11 (E.D.N.Y. June 11, 2019) ("[*Rambus*] is inapposite as … it

did not involve a motion to dismiss at the pleadings stage."); *Apple v. Samsung*, 2011 WL

4948567, *5 ("*Rambus* identified a failure of proof, not a failure of pleading").

Further, under *Rambus*, "[a] monopolization claim based on failure to disclose to an SSO

must allege: (1) the defendant was obligated to disclose its intellectual property rights to the SSO

and failed to do so; (2) the failure to disclose was deceptive; (3) the SSO developed a standard

that reads on defendant's intellectual property rights and has been adopted by the relevant

market; and (4) but for the failure to disclose, the SSO would have developed a different

---

[7] Ironically, Defendants highlight their delay in applying for the '141 Patent (a year after the current version of the NSF/ANSI 53 standard was adopted in 2007), in receiving the patent (five years after) and in commencing patent litigation (16 years after). (Def. Br. at 3.) In fact, these admissions support an inference that the industry was "locked in" to the standard before Defendants began asserting their intellectual property rights, setting up a "patent ambush." *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007). This is precisely what ZeroWater has alleged: "Following the adoption of the NSF/ANSI 53 Standard in 2007, Brita continued its deception until the industry was 'locked in' to that standard, with all of Brita's competitors investing time, money, and other valuable resources in products that meet the standard and obtaining certification of those products, before beginning its patent offensive." (Compl. ¶ 11.)

standard." *Actividentity Corp. v. Intercede Group PLC*, No. C 08-4577, 2009 WL 8674284, *3, (N.D. Cal. Sept. 11, 2009) (citing *Rambus*, 522 F.3d at 463). As this Court observed in denying Defendants' motion to dismiss for improper venue:

> In the patent ambush context, the wrong that furnishes the antitrust claim is a defendant's participation in a standard-setting organization without disclosure of the patent, and then, use of the patent after competitors are locked in, to effectuate or attempt to effectuate a monopoly. Thus, the point is not just whether Brita's '141 Patent is a standard essential patent such that it had a legal patent right to exclude others who were certified pursuant to the NSF/ANSI 53 standard; rather, this is just one small part of the evidence ZeroWater might establish to show Brita monopolized or attempted to monopolize and the alleged antitrust harm.

(Doc. 51 at 34-35.) Here, ZeroWater has plausibly alleged that Defendants were obligated to disclose their patent intentions and patents to the NSF, yet deceptively failed to do so, as set forth in detail above.[8] (*See generally* Compl. ¶¶ 27-71.)

ZeroWater has also plausibly alleged that the Defendants' patent reads on the NSF/ANSI 53 lead-reduction standard—that is, ZeroWater alleges that to market a commercially viable product that meets the standard for lead reduction, one must infringe the '141 patent. (*See* Compl. ¶¶ 84-91.) "Because the ability to make certain contaminant reduction claims with certification by the NSF is effectively required for the sale and marketability of high performance gravity-fed water filters, and Brita's '141 Patent prevents competing products from meeting and being certified under the lead standard, the market will be devoid of products to compete with Brita's own." (Compl. ¶ 16.) Further, ZeroWater specifically alleges that Brita ambushed "every single one of its competitors certified under the NSF/ANSI 53 standard selling products in the United States." (Compl. ¶ 102). Defendants dispute this allegation (*See* Doc. 46

---

[8] Whether Robert Herman, a witness in the ITC proceeding who is not associated with Defendants, knew about the applicable NSF policies is irrelevant. (*See* Def. Br. at 4.) And any such testimony falls far outside the scope of material that can properly be considered on a Rule 12 motion without converting it into a motion for summary judgment.

at 2; Defendants' Answer at ¶ 39)—raising a material factual dispute that cannot be resolved on the pleadings—but tellingly have never identified any manufacturer they refrained from suing that offers for sale in the United States a gravity-fed water filter bearing the certification seal for lead reduction under NSF/ANSI 53.

Further, the question of whether the '141 Patent covers all commercially viable competing products in the relevant market is itself a disputed fact issue that cannot be resolved on a Rule 12 Motion. Defendants cite expert opinion testimony from the ITC proceeding "that it is possible for a filter to meet the NSF 53 Standard *without* infringing the '141 Patent." (Def. Br. at 4 (emphasis in original), 12.) But Defendants misrepresent that evidence to the Court as the testimony of ZeroWater's expert, Dr. Gary Hatch, when in fact it was the testimony of *Brita's* expert, Dr. Benny Freeman. (**Ex. 2** hereto (excerpts of Oct. 13, 2022 ITC Trial Tr. at 1383 (identifying Paul Ainsworth, Esq. as counsel for Brita), 1480-87 (Dr. Freeman offered and accepted as expert witness on behalf of Brita), 1530-31 (Dr. Freeman gives the testimony cited by Defendants).) By contrast, another expert witness, Robert Herman, testified on behalf of ZeroWater and the other ITC respondents that no commercially viable filter could meet the NSF/ANSI 53 standard without infringing the '141 Patent. (**Ex. 3** (excerpts of Aug. 22, 2022 ITC Trial Tr. at 1006-1010 (Mr. Herman offered and accepted as expert witness on behalf of ITC respondents, including ZeroWater), 1027-1028 (Mr. Herman testifies that a commercially viable product could not "pass NSF Standard 53" without "meeting the FRAP equation"—that is, falling within the scope of the '141 Patent).)[9]

---

[9] ZeroWater maintains its objection to considering the ITC testimony of Dr. Freeman, or any other witness, in the context of a motion for judgment on the pleadings, as explained above in section II.A. But it is important for the Court to know that the testimony in Exhibit I to Defendants' "Request for Judicial Notice" is not even what Defendants claim it to be and cannot be imputed to ZeroWater. Further, ZeroWater will show, to the extent necessary following

The remaining issue under *Rambus* is whether ZeroWater has adequately alleged that Defendants' failure to disclose patent intentions or patents reading on the NSF/ANSI 53 standard *caused* its antitrust injury. *Rambus*, 522 F.3d at 466 ("An antitrust plaintiff [in a disclosure suit] must establish that the standard-setting organization would not have adopted the standard in question but for the misrepresentation or omission."); *see also Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1273 (3d Cir. 1995) (a plaintiff in a § 2 case "must prove a causal connection between [the antitrust violation] and actual damage suffered.").

Defendants claim that to plead causation "[u]nder *Rambus*, ZeroWater must … allege that Defendants' failure to disclose the '141 Patent induced the NSF to set the NSF 53 Standard to incorporate the '141 Patent, rather than a *specific alternate technology*." (Def. Br. at 12, 14 (emphasis added).) But *Rambus* is of limited applicability here because of the type of standard it considered, namely a ***technological interoperability standard***. As described in *Apple v. Samsung* (also a technological interoperability case), "[t]o facilitate the interoperability necessary for various manufacturers' products to function [together], standards setting organizations … establish precise specifications for essential components of the technologies." *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846, 2012 WL 1672493, *1 (N.D. Cal. May 14, 2012); *see also Broadcom*, 501 F.3d at 308. Accordingly, causation in cases involving interoperability standards turns on the availability of "excluded alternative technologies that were available to perform the same functions" that, before the standard was enacted, "compete[d] to perform each of the various functions covered by … essential patents." *Apple v. Samsung*, 2012 WL 1672493, at *2, *5.

---

discovery, that notwithstanding Dr. Freeman's technical opinions expressed in the ITC action, neither a larger, slower filter nor a "pressurized" filter would be commercially viable or fall within the relevant market for high-performance gravity-fed water filters.

Put another way, the issue before the SSO in *Rambus* was a choice between several competing available technologies for computer memory chips. Such a choice between specific standards for the purpose of technological convenience is not at issue in this case. Rather, at issue here is the adoption of the 2007 version of NSF/ANSI 53, which added requirements specifically for lead reduction to meet a health-effects standard. The NSF committees responsible for the NSF/ANSI 53 standard were not choosing among several competing technologies—rather, they were agreeing on an approved standard for adequately removing lead from drinking water via a gravity-fed filter. Simply put, the NSF was not limited to making a binary choice as in *Rambus*, having instead an indeterminate number of alternative options— including doing nothing if NSF had known that adopting this standard would mean handing Defendants a monopoly.[10]

Cases involving testing standards—where there are not alternative technologies at issue but rather a consensus on *the* way to test something—are more instructive. In *Amphastar Pharmaceuticals Inc. v. Momenta Pharmaceuticals, Inc.*, 850 F.3d 52, 54 (1st Cir. 2017), "the defendants, in violation of a duty imposed by the [SSO], knowingly failed to disclose to the standard-setting body that a proposed method for testing generic enoxaparin might be covered by Momenta's pending patent application. The [SSO], in reliance on the defendants' misrepresentations, adopted the method…."). The First Circuit reversed the district court's order granting a motion to dismiss counterclaims under Section 2 of the Sherman Act. *Id*. at 58. On remand, the district court recognized that, with regard to standards for testing, "the existence of

---

[10] ZeroWater has also alleged that Defendants' patent purports to cover *every* possible technology that satisfies certain performance criteria under the "FRAP" formula described in the Complaint. (Compl. ¶¶ 76-78.) And indeed, that aspect of the patent was a substantial basis for the ITC's determination that the patent is invalid. (*See* ITC Opinion, Doc. 67-11 at ECF pp.12-39.)

alternatives is a factual question inappropriate for resolution on a motion to dismiss." *Amphastar Pharm. Inc. v. Momenta Pharm., Inc.*, 297 F. Supp. 3d 222, 229 (D. Mass. 2018).

Even more on point, *Provepharm, Inc. v. Akorn, Inc.* involved not only a testing standard but, precisely as Defendants have characterized the facts here, a "pre-existing [] standard that had already been adopted by the SSOs which the defendants merely sought to revise." No. 17-CV-7087, 2019 WL 2443185, *11 (E.D.N.Y. June 11, 2019). (*See* Defendants' Answer ¶ 5 ("Defendants admit that the NSF/ANSI 53 Standard offers over 50 contaminant reduction claims, and that there was an update to [*sic*] NSF/ANSI 53 Standard that bears back to the date 2007.").) The district court observed that this factor distinguished the case before it from *Rambus* and criticized the application of *Rambus*'s alternative-technology requirement to the amendment of an extant standard. "The Court is not necessarily persuaded that this is a proper pleading standard, as opposed to an evidentiary standard." *Provepharm*, 2019 WL 2443185, *11n 16. This is particularly so given that, in the case of amendment of a testing standard, an option available to the SSO is not to amend the standard at all in the event it would create an unintended monopoly. Unlike in alternative technology cases, "drawing all reasonable inferences in favor of [plaintiff] … since there was an existing [standard], it may be reasonably inferred that had [defendant] disclosed its patent rights … ***the standard would not have been revised … at all***." *Id.* at *12 (emphasis added). This is precisely what ZeroWater has alleged. (Compl. ¶ 109 ("Upon information and belief, had Brita disclosed the existence of its patent rights, applications, and related intentions that impacted the NSF/ANSI 53 standard, NSF would not have adopted the standard in the form that it did.").)

**3.     ZeroWater pleads plausible Section 2 claims under *Broadcom*, though the defendant's conduct in *Broadcom* was less egregious than Defendants' conduct here**

ZeroWater's claims are equally viable under *Broadcom*, despite that decision being distinguishable on its facts. In *Broadcom*, the patent holder—unlike these Defendants—did disclose the patent's existence to the SSO. Nevertheless, ZeroWater's allegations fit squarely within the concern that *Broadcom* recognized:  namely, that "to guard against anticompetitive patent hold-up, most [SSOs] require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms." *Broadcom*, 501 F.3d at 313. *Broadcom* held that "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with an [SSO's] reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent *breach of that promise*, is actionable anticompetitive conduct." *Id*. at 314 (emphasis added).

As set forth above, ZeroWater has alleged that Defendants agreed to be bound by the ANSI Patent Policy contained in the ANSI Essential Requirements, which requires participants in the standard-setting process to provide assurances that either the "party does not hold and does not currently intend holding any essential patent claim(s)" <u>or</u> that it will license those rights at no cost or FRAND terms and rates in the event the standard is enacted notwithstanding the existence of a standard essential patent." (Compl. ¶ 45; *see also* ¶ 50) (internal quotations omitted.) Despite these plainly worded allegations, Defendants try to distinguish *Broadcom* on a factual basis that is not material here. *Broadcom*, they claim, requires a demand for *excessive* license fees, and "ZeroWater does not allege that Defendants have ever sought to license the '141 Patent, much less demand supracompetitive royalty rates from ZeroWater or any other industry participant." (Def. Br. at 10). Of course, on the latter point, Defendants are correct:

14

ZeroWater alleges that Defendants have to date wielded the '141 Patent as aggressively as possible to put its competitors out of business altogether, rather than try to extract supracompetitive royalties. Offering a license to competitors was not part of Defendants' anticompetitive plan.[11]

Accordingly, though *Broadcom* and other cases dealing with a demand for excessive or unfair license fees are distinguishable on the basis that Defendants here never offered a license at all, *Broadcom* imposes no affirmative requirement that there be an offer of a license by the patent holder. And Defendants' failure to offer any license at all fits squarely within the broader principles stated in *Broadcom*, because it is just as much a breach of the commitment to offer a license on FRAND terms as demanding excessive license fees would be. 501 F.3d at 315-16 ("that FRAND assurances were required … as well as allegations concerning the [SSO's] reliance on [defendant's] assurances … satisfy the second element of a § 2 claim."). Simply put, *Broadcom* requires only a breach of a commitment to offer a FRAND license to competitors who wish to practice the standard. None of the authorities that Defendants cite stand for the proposition that a complete failure to license is somehow immune from the antitrust laws. (Def. Br. at 9-10.) *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1035 (W.D. Wash. 2012) (stating "it does not follow that negotiating in good faith is a condition precedent" to a claim for breach of a FRAND commitment, and "neither applying for a license nor negotiating good faith for a license are conditions precedent to [defendant's] obligations to grant licenses on [F]RAND terms."); *see also Amphastar*, 850 F.3d at 54 (reversing district court's

---

[11] Defendants were not just deceptive before NSF but also to their competitors. To demand any license payments would have required Defendants to affirmatively disclose the '141 Patent to ZeroWater and other competitors—precisely what they sought to avoid doing until ready to spring their patent ambush.

grant of motion to dismiss where there was no demand for a license and, like Defendants here, the patent holder simply brought patent litigation against the antitrust plaintiff).

Defendants next claim to be immune from the antitrust laws under the *Noerr-Pennington* doctrine because, rather than attempt to extract supracompetitive royalties based on their undisclosed patent, their initial salvo was filing patent litigation against ZeroWater (which could, of course, plausibly be a tactic aimed at ultimately extracting supracompetitive royalties). However, "where 'the antitrust violation is intentional deception of the standard-setting organization,' the mere fact that the alleged damages are based, in part, on a lawsuit seeking an injunction does not 'defeat the antitrust claim based on conduct before the standard-setting organization.'" *Amphastar*, 850 F.3d at 57 (quoting *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at *3); *see also id.* at 57-58 ("the mere fact that the defendants brought protected patent litigation against Amphastar does not immunize them from liability for the full amount of damages caused by their alleged antitrust violation."). And *Hynix*, cited approvingly by Defendants, expressly recognizes that under *Rambus*, patent litigation "causally connected" to deception before an SSO is not immune from antitrust liability under *Noerr-Pennington*. *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007) ("To be clear, the causal connection is that a patent 'ambush' or 'hold-up' is ineffective without the threat of litigation."). ZeroWater has amply alleged how Defendants' patent litigation against ZeroWater and others furthers Defendants' anticompetitive scheme.

Furthermore, Defendants' deceit and successful manipulation of the market have created the structural *potential* to extract unfair royalties found in *Broadcom* and other cases. *Broadcom*, 501 F.3d at 310 (citing *In the Matter of Rambus, Inc.*, No. 9302, at 4, 2006 FTC LEXIS 60 (F.T.C. Aug. 2, 2006), available at 2006 WL 2330117 (once standard becomes locked in, the

patent holder "*may* be able to extract supracompetitive royalties from the industry participants.") (emphasis added)); *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) (patent hold-up occurs when, "once a standard has gained such widespread acceptance that compliance is effectively required to compete in a particular market, anyone holding a standard-essential patent *could* extract unreasonably high royalties from suppliers of standard-compliant products and services") (emphasis added).

Far from being a saving grace, failing to disclose their patent and not offering a license to any competitor isn't an exception to the antitrust laws—it's evidence that Defendants' goal is to eliminate all competition in the service of their monopoly in the relevant market.

### C. ZeroWater plausibly alleges monopoly power or, in the alternative, a dangerous probability of achieving monopoly power

Monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). A plaintiff may plead the existence of monopoly power either directly, or circumstantially through allegations about the structure of the relevant market. *United States v. Dentsply, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). ZeroWater's Complaint sets forth allegations that plead monopoly power—or, in the alternative, a dangerous probability of achieving monopoly power—directly. For example, Defendants' actions with respect to NSF/ANSI 53 and the '141 Patent were intended to "doom the marketability of competing products, with the aim of Brita acquiring an unlawful monopoly" in the relevant market. (Compl. ¶ 15; *see also id*. ¶¶ 87 (Defendants acted to "preclude Brita's competitors from marketing a commercially viable high-performance gravity-fed water filter"), 91-92, 94, 132, 139-140, 149.) Further, the relevant market has high barriers to entry, including substantial costs for the certification needed to make a competing product marketable. (*Id*. ¶ 127.) And the Complaint

cites Defendants' own assertions about Brita's market dominance, including Brita's claims to be the "#1 brand of water filtration" and "a leader in the consumer water filter product market," that its name is "synonymous with water filters," and that it intends to "maintain" its "position" in the market. (*Id.* ¶ 133.)[12] Based on these factors, Brita is or will be able to charge monopoly prices in the relevant market. (*Id.* ¶¶ 16-17, 143, 151.) These allegations, without more, are sufficient to plead monopoly power directly under *Dentsply*.[13]

Further, Defendants cannot plausibly argue that they do not have or seek a monopoly in the relevant market, because the whole point of Brita's infringement actions against ZeroWater and other competitors is to drive anyone with a competing, commercially viable product that is certified to comply with NSF/ANSI 53's lead standard out of that market. (*Id.* ¶¶ 91, 106.) In other words, if one credits Defendants' own requested relief in their infringement proceedings as an accurate statement of their objectives, then Defendants are laying claim to 100% of the relevant market. And these same facts evince Defendants' specific intent to monopolize that market. Defendants fail to explain how they could expressly assert a right to monopoly power in

---

[12] Though Defendants complain they cannot tell whether the "water filter products market" that is the subject of their boasts is the same as the relevant product market alleged in the Complaint (Def. Br. at 19-20), it is reasonable to infer that there is no material difference. Defendants offer no reason to doubt that their dominance of the U.S. consumer water filter products market would either be the same as, or a reasonable proxy for, their dominance of the U.S. market for NSF/ANSI 53 lead-certified high-performance gravity-fed water filters, especially in light of the Complaint's well-pled allegations that such certification is essential to marketability. And under Rule 12, ZeroWater is entitled to the benefit of that reasonable inference.

[13] Defendants rely on the non-precedential *St. Clair v. Citizens Financial Group*, 340 F. App'x 62 (3d Cir. 2009), to argue that ZeroWater's allegations do not plausibly support an inference of monopoly power. (Defendants' Br. at 20.) But there the court found that the plaintiff failed to plead "any facts regarding the strength of competition, the nature of the anticompetitive conduct, or the elasticity of consumer demand" and that the plaintiff's allegations about barriers to market entry were merely conclusory. *Id.* at 66. Here, by contrast, ZeroWater pleads detailed descriptions of Defendants' anticompetitive conduct and the relevant market, as well as non-conclusory allegations concerning barriers to market entry.

one set of proceedings based on the '141 Patent, while denying the existence of their monopoly

power, or a dangerous probability of achieving it, in this antitrust case.

Finally, upon information and belief and subject to confirmation in discovery, Brita has a

relevant market share in the neighborhood of 65%-75%. (ZeroWater has outstanding discovery

requests to Defendants seeking documents sufficient to show Brita's market share definitively,

but Defendants have not yet produced the relevant information.) In other words, ZeroWater

could, if necessary, plead that allegation to further show that Brita has "a predominant share of

the market" from which "the existence of monopoly power may be inferred." *Dentsply*, 399 F.3d

at 187 (noting "a share significantly larger than 55% has been required to establish prima facie

market power."). ZeroWater respectfully submits, however, that its existing allegations are

already sufficient.

### D.      ZeroWater plausibly alleges antitrust injury

ZeroWater's Complaint alleges ample facts to plausibly show that (a) Defendants'

conduct is injurious to competition and consumer welfare and (b) the harm to ZeroWater flows

from that same unlawful conduct. First, the Complaint alleges that Defendants' deceptive

conduct in violation of procompetitive NSF policies was aimed at excluding from the market all

commercially viable competing products that meet the NSF/ANSI 53 lead-reduction standard.

(*See, e.g.*, Compl. ¶¶ 11, 15, 91.) The natural and foreseeable consequences of that conduct

include enabling Defendants to charge consumers monopoly prices (*id.* ¶ 143), discouraging

market entry by new competitors (*id.* ¶¶ 143, 144), depriving consumers of access to competing

products, including those that offer additional benefits beyond Defendants' products (*id.* ¶¶ 101,

143), and suppressing innovation in the relevant market (*id.* ¶ 144). In other words, ZeroWater

has alleged archetypal harms to the competitive process and to consumers, not just injury to

itself. This feature distinguishes ZeroWater's Complaint from that in *Philadelphia Taxi*

*Association v. Uber Technologies*, where the Third Circuit found that the plaintiffs had pled only

harm to their own market share or ability to sustain higher prices, without any attempt to explain

how the challenged conduct's alleged effect on prices, quantity, or quality of goods or services

"harm[ed] the market, and thereby harm[ed] the consumer." 886 F.3d 332, 338, 343-45 (3d Cir.

2018).

ZeroWater's Complaint also explains how the same conduct by Defendants—exploiting

their participation in the NSF standard-setting process to benefit themselves while silently

planning to use patent law to lay claim to the entire field of commercially viable products that

can meet the resulting standard—has also injured ZeroWater. By not disclosing their patent

rights and intentions during or after the standard-setting process, Defendants effectively duped

ZeroWater (as well as, presumably, other competitors) into devoting resources for years to

obtaining and maintaining certification under the NSF/ANSI 53 standard that is key to

marketability of the products, leaving the competition unable to pivot quickly to alternatives

once Defendants asserted their monopoly power. (Compl. ¶¶ 16, 98, 102, 113, 118, 120-122,

140, 149.) Defendants have also attacked ZeroWater and other competitors directly, filing the

ITC proceeding and patent infringement litigation against them to drive up their costs and

hamper their ability to compete. (*Id*. ¶¶ 102-103, 105-106.) And the more Defendants succeed in

their stated aims, the more they will effectively exclude ZeroWater and other competitors from

the relevant market, proximately causing loss of profits, customers, and goodwill. (*Id*. ¶¶ 142,

150.) Because the harms to ZeroWater are an inextricable part of Defendants' assault on

competition, ZeroWater's injury, as pled, is "of the type the antitrust laws were intended to

prevent and … flows from that which makes defendants' acts unlawful." *Philadelphia Taxi*

*Ass'n*, 399 F.3d at 343 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

### E. ZeroWater plausibly alleges that Defendants breached a contract of which ZeroWater is a third-party beneficiary

Defendants argue, in the face of the Complaint's detailed allegations to the contrary, that ZeroWater fails to plead "the existence of a contract between Defendants and NSF." (Def. Br. at 23-24.) But that argument ignores at least fourteen paragraphs of the Complaint that describe in detail all of the SSO policies to which Defendants were subject as participants in the standard-setting process. (Compl. ¶¶ 38-51, 161.) Those paragraphs detail how the NSF Standards Development and Maintenance Policies, the NSF Antitrust Guide, the ANSI Essential Requirements including the ANSI Patent Policy, and the ANSI Guidelines for Implementation of the ANSI Patent Policy (including its embedded Antitrust Policy) impose on Defendants an ongoing duty to disclose their patent rights and intentions.

It is well established that SSO policies are contractual in nature and binding on participants. *G+ Comms., LLC v. Samsung Electronics Co. Ltd.*, No. 2:22-CV-00078, 2023 WL 3167416, at *4 (E.D. Tex. Apr. 28, 2023) (finding Samsung was contractually obligated to follow the intellectual property policy of an SSO of which it was a member); *In re Innovatio IP Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925, 933 (N.D. Ill. 2013) (holding SSO's bylaws were contractually binding on member to determine scope of member's obligation to license technology at fair and reasonable royalty); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1083-85 (W.D. Wis. 2012) (finding SSO policies and bylaws, along with other commitments made to SSOs, were contractually binding on Motorola as SSO member, and granting summary judgment in favor of Apple as to the existence of such contractual obligations); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846, 2012 WL

1672493, at *9-15 (N.D. Cal. May 14, 2012) (analyzing SSO policies as contractually binding on Samsung as SSO member). In *Apple v. Samsung*, the court specifically held that failure to abide by an SSO policy requiring timely disclosure of relevant intellectual property rights was actionable as a breach of contract—just as ZeroWater alleges here. *Id*. at *13. Therefore, the SSO policies described in the Complaint are contracts between Defendants and the NSF—the NSF policies directly, and the ANSI policies through incorporation into the NSF policies.

Defendants' argument that ZeroWater fails to plead third-party-beneficiary status is equally misguided, erroneously contending that paragraph 162 is the sole relevant factual allegation. Case law establishes that one who implements a standard promulgated by an SSO is a third-party beneficiary of the contractual SSO policies governing the development of that standard. *G+ Comms*., 2023 WL 3167416, at *4-5 (finding plaintiff sufficiently pled it was third-party beneficiary of SSO policies that were contractually binding on Samsung); *Innovatio*, 956 F. Supp. 2d at 933 (holding users of standard to be third-party beneficiaries of Innovatio's corporate predecessors' agreements with SSO); *Apple v. Motorola*, 886 F. Supp. 2d at 1085 (holding Apple was third-party beneficiary of SSO policies that were contractually binding on Motorola). And the Complaint is replete with allegations that ZeroWater—along with Defendants' other competitors in the relevant market—is implementing the NSF/ANSI 53 standard; indeed, all market participants are effectively "locked in" to that standard. (Compl. ¶¶ 16, 69, 94, 98-101, 113-116, 120-121.) Accepting those allegations as true, it follows as a matter of law that ZeroWater is a third-party beneficiary of the NSF and ANSI policies described in the Complaint,

and more specifically of the portions of those policies that required Defendants to disclose their

patent rights and intentions during and after the standard-setting process. (*Id*. ¶¶ 162, 164.)[14]

### F.    ZeroWater plausibly alleges a breach of the duty of good faith and fair dealing

"Every contract imposes on each party a duty of good faith and fair dealing in its

performance and its enforcement." *Kaplan v. Cablevision of Pa., Inc*., 671 A.2d 716, 721-22 (Pa.

Super. Ct. 1996). It is appropriate to plead a breach of the duty of good faith and fair dealing, in

the alternative to a breach of an express term of the contract, where the implied duty rather than

an express term may ultimately be found to govern the defendant's conduct. *See, e.g.*, *Ross v.

Canada Life Assurance Co.*, No. Civ. A. 94-5557, 1996 WL 182561, *7-8 (E.D. Pa. Apr. 16,

1996) (permitting claim for breach of duty of good faith and fair dealing as alternative to claim

for breach of express contractual term); *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1059

(Pa. Super. Ct. 1999) (reversing dismissal of a claim for breach of contract and simultaneous

claim for "failure to deal in good faith," and reviving both claims on remand). While ZeroWater

contends that Defendants breached express contractual obligations to NSF, there is nothing

improper in also pleading a breach of the duty of good faith and fair dealing in the alternative.

Further, even if such a claim could not be maintained separately, that would not be

grounds to dismiss Count V with prejudice. Instead, the Court should deem the allegations of

Count V to be part of the breach of contract claim. That was the solution adopted in *Wulf v. Bank

---

[14] By contrast, Defendants rely solely on inapposite cases that involved bilateral private
agreements, not contractually binding SSO policies. (Defendants' Br. at 25.) *Sovereign Bank v.
BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008) (contract between bank and credit card
issuer); *Brown v. Wexford Health Sources, Inc*., No. 16-CV-1680, 2018 WL 3156856 (W.D. Pa.
June 28, 2018) (*pro se* prisoner not allowed to proceed on claim of breach of contract between
health care provider and Commonwealth of Pennsylvania); *Fluke v. Heidrick & Struggles, Inc*.,
No. Civ. A. 02-CV-8385, 2003 WL 22316772 (E.D. Pa. Aug. 27, 2003) (contract between
employer and company retained to conduct evaluations for executive recruitment).

*of America, N.A.*, 798 F. Supp. 2d 586, 588, 594 (E.D. Pa. 2011) (dismissing count for breach of duty of good faith and fair dealing but decreeing that "the allegations in that count are incorporated into the breach of contract count."). It makes little difference here, as a practical matter, whether the Court allows Count V as a properly pled alternative to Count IV or deems the allegations of Count V subsumed within Count IV.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Judgment on the Pleadings should be denied in its entirety. But if the Court determines that Defendants' motion has merit as to any of the claims, ZeroWater respectfully requests the opportunity to amend its Complaint as needed—especially as Defendants have made no effort to demonstrate that amendment would be futile. *See Hu v. Herr Foods, Inc.*, 251 F. Supp. 3d 813, 822-25 (E.D. Pa. 2017) (leave to amend required when granting Rule 12(c) motion, provided amendment would not be futile); *Pesa v. Scandinavian Airlines Syst.*, No. 2:19-CV-20415, 2021 WL 1660863, *9 (D.N.J. Apr. 27, 2021) ("Before dismissing a complaint under Rule 12(c), a district court must permit a curative amendment, unless an amendment would be inequitable or futile.") (internal quotations omitted).

Dated:  June 25, 2024

Respectfully submitted,

By:  /s/ *Jeffry W. Duffy*

Carl W. Hittinger (PA 30250)
Jeffry W. Duffy (PA 81670)
Julian D. Perlman (PA 326602)
Alyse F. Stach (PA 328562)
BAKER & HOSTETLER LLP
1735 Market Street
Suite 3300
Philadelphia, PA  19103-7501
chittinger@bakerlaw.com
jduffy@bakerlaw.com
jperlman@bakerlaw.com
astach@bakerlaw.com
(215) 568-3100

Jeffrey E. Liskov (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
jliskov@bakerlaw.com
(202) 861-1500

*Attorneys for Plaintiff*
*Zero Technologies, LLC*

25